# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

============================

## ON MOTION FOR REHEARING

============================

### NO. 03-03-00376-CV

**Springs Window Fashions Division, Inc.; Springs Window Fashions, L.P.; and SWF, Inc. d/b/a SC-SWF, Inc., Appellants**

**v.**

**The Blind Maker, Inc., Appellee**

============================

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT NO. GN002888, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING**

============================

## O P I N I O N

We grant the motion for rehearing of appellants, Springs Window Fashions Division, Inc., Springs Window Fashions, L.P. and SWF, Inc. d/b/a SC-SWF, Inc. ("Springs"), withdraw our opinion and judgment of July 29, 2005, and substitute the following in its place.

Springs appeals a judgment awarding appellee, The Blind Maker, Inc., $5,167,240 in actual damages and $2,090,000 in exemplary damages. The sole liability theory submitted to the jury was fraud, and the sole element of actual damages submitted was lost profits as consequential damages. Springs asserts that the evidence is legally and factually insufficient to support either a

finding of fraud or the damages award.  For reasons we explain below, we conditionally affirm the judgment of the trial court.

## BACKGROUND

**The parties and their businesses**

Springs manufactures blinds and similar window coverings and sells its products under the brand names Graber, Nanik, and Bali.  The ultimate consumers of Springs's products are persons who purchase the blinds for use in their homes or offices.

Springs distributes its products to consumers chiefly through two channels.  First, Springs sells fully assembled blinds directly to large retail outlets like Home Depot or Lowe's.  This retail channel of distribution, as well as other lower-priced sales channels like 800 numbers and the Internet, have put significant downward pressure on prices within the blinds industry.  Springs's second distribution channel is the "distributor/fabricator" channel.  Springs sells component parts of its blinds to blinds fabricators who have business relationships with retail establishments like paint and hardware stores, or individual interior designers, decorators, and architects.  These retail-level customers of the blind fabricator, in turn, sell to ultimate consumers.  Utilizing samples and other promotional materials, the retail-level customers obtain from consumers color and style preferences, window measurements and other specifications and transmit them in orders to the blind fabricator.  The blinds fabricator then "fabricates" custom-made blinds by cutting and assembling the appropriate Springs components in accordance with consumer specifications.[1]

_____

[1] Springs apparently would also fabricate some brands of its blinds itself and sell them to blind fabricators for distribution to retail customers and ultimate consumers.

Blind Maker is a blinds fabricator based in Austin, with facilities also in Dallas and Houston. It was established in 1981 by Ray Hicks, its president and sole shareholder. Hicks started the company after earning his M.B.A. The families of both of Hicks's parents had been involved in the blinds industry for many years. Blind Maker began fabricating and selling Springs's Graber brand in 1983 or 1984. Blind Maker experienced steady growth throughout its history. In its first year of operation, Blind Maker's sales totaled $627,656. Ten years later, Blind Maker had over $11,000,000 in sales. Blind Maker's annual sales tripled in the 1990s—its 1998 figure exceeded $35 million—ranking it as the largest fabricator of Graber products in the nation. Despite Blind Maker's large annual sales figures, the company's annual net profits during the 1990s averaged around $37,000, or just over one percent of total sales.[2] Blind Maker's history of small net profits reflects, among other things, a corporate strategy of financing its rapid and continuous growth through capital investment and of paying large salaries to its executives, including Hicks, to avoid double taxation.

Hicks testified at trial that, throughout the 1990s, Blind Maker voluntarily chose to sell almost exclusively Graber products and considered itself the "Graber guys."[3] Blind Maker also prided itself in being a "full line" Graber fabricator, carrying the components necessary to fabricate the complete range of Graber products. The company strove to fill and ship orders from its retail-level customers on the same day they were received. These strategies required Blind Maker to

---

[2] The company recorded losses in 1990, 1994, and 1996. In other years of the decade, net income ranged from $132,594 (on sales of over $24 million) in 1995 to $23,405 (on sales of over $11 million) in 1991.

[3] Hicks testified that over 97% of Blind Maker's sales were comprised of Graber products and that its occasional exceptions typically occurred when it utilized another brand's product to complement a Graber product.

maintain large inventories—Hicks testified that the company would frequently carry six million dollars in inventory, which would take roughly two months to turn over through sales. Hicks added that Blind Maker took around another month to collect its accounts receivable from sales, meaning that it could take three months or more to realize cash from the sale of inventory it purchased from Springs.

Throughout Blind Maker's seventeen-year relationship with Springs, Hicks expressed concern that Springs's business practices in the distributor/fabricator channel reduced Blind Maker's profitability. Chief among Hicks's complaints were Springs's perceived emphasis on its lower-priced retail channel at the expense of its fabricators, a lack of "price parity" enabling Blind Maker to compete with large retailers, and sales incentives that Hicks believed rewarded fabricators who made small or occasional purchases from Springs while penalizing "full line" fabricators like Blind Maker. Hicks urged a series of changes in Springs's business practices that he believed would enhance profitability for both Springs and "full line" fabricators and revisited them periodically throughout the parties' relationship. These proposals, which included special incentives for a designated class of committed "Full Line Graber Fabricators," became known to both parties as "Ray's Obsessions."

For many years, Springs and Blind Maker did business without a written contract—Blind Maker would order Springs's components as needed, Springs would invoice Blind Maker, and Blind Maker would pay. Hicks testified that Springs always permitted Blind Maker to pay later than the due date on the invoice. Furthermore, while the invoices stated that Blind Maker could take a 2% discount if it paid within fifteen or thirty days, Springs "forever" allowed Blind

4

Maker to take the discount whenever it paid. Hicks explained that Springs did this in recognition of Blind Maker's preeminence as a Graber fabricator and the duration of its cash cycle.

In 1997, for the first time, Springs and Blind Maker entered into a formal credit agreement at Springs's request. In that agreement, Blind Maker acknowledged that Springs "is not obligated to sell goods to [Blind Maker] or to grant open account payment terms," and that "[t]he decision to sell product and extend credit shall be solely within the exclusive discretion of Springs." The agreement further provided that Blind Maker "hereby agrees to make payments as necessary to keep the account balance within terms established by Springs" and that if Blind Maker failed to do so, Springs "may immediately suspend all future shipments on other than prompt payment terms such as cash or cashier's check and may further demand immediate payment of the full balance."[4]

**Project Overlord**

The overriding theory of Blind Maker's case at trial was that Springs committed a variety of fraudulent acts in furtherance of a plan to take over existing fabricators, move the fabrication process to Mexico, and utilize the prior fabricators as distributors. This plan was termed Project Overlord. Various Springs executives testified to the existence of Project Overlord, but there

---

[4] In such an instance, moreover, Blind Maker agreed to pay Springs reasonable attorney's fees and other costs of collection.

Subsequently, in February 1998, Springs loaned Blind Maker $500,000, which the company used to pay down certain aged accounts payable to Springs. In exchange, Blind Maker granted Springs a security interest and made a promissory note under which it agreed to pay off the balance in monthly installments of approximately $56,000. It appears that Blind Maker satisfied this obligation.

was some disagreement over the extent to which it was implemented.[5]  However, evidence of the implementation of the plan was presented at trial, including the purchases of fabricators, debt-for-equity swaps to acquire fabricators having large accounts payable to Springs,[6] and the acquisition of a blinds manufacturing plant in Reynoso, Mexico.  There was testimony that Blind Maker was a target of Project Overlord and that Springs ultimately acquired as many as three other fabricators.

**The Fabricator License Agreement**

Beginning in 1998, Springs took additional steps to formalize its relationship with Blind Maker and other blinds fabricators, including the initiation of a "preferred fabricator" program and the utilization of a licensing contract.  Blind Maker characterized these steps as tools used by Springs to advance Project Overlord.  Blind Maker's fraud claim is based largely on a series of alleged misrepresentations and failures to disclosure information regarding these new business initiatives.  We accordingly explore this evidence in some detail.

### The pilot program

In August 1998, Springs invited Hicks and representatives from a handful of other Graber fabricators to a meeting at Springs's Wisconsin headquarters.  At the meeting, Springs unveiled the concept of a "Fabricator Pilot Program," which it termed a "Joint Partnership."  The stated goal of the pilot program was to "[s]trengthen our partnership through the design of effective

---

[5] Although some witnesses testified that Project Overlord was rejected by Springs management, others testified that parts of Project Overlord were, in fact, implemented.

[6] In other words, Springs would forgive the fabricator's debt in exchange for an ownership stake in the fabricator.

programs that enhance market position and increase profitability for our fabricating partners and Springs." Key components were efforts to build product and brand awareness (through advertising assistance and incentives), market penetration and sales growth (through new product development and possibly a "value brand" or "fighter brand" to compete with lower-priced private label brands), margin enhancement (through rebates and a fund that accrues a percentage of purchase totals for use in certain purchases), and a formal agreement between Springs and each "preferred" fabricator. With regard to the latter, Springs proposed the concept of a "Fabricator License Agreement" (FLA) that would grant participating fabricators a limited license to use Graber's trademarks, provided they adhered to quality standards and manufacturing specifications to preserve the value of the trademarks and promote uniformity and interchangeability among Graber products and parts. All Springs fabricators would be required to sign the FLA.

In addition, Springs introduced the concept of a three-tiered classification of its "Fabricating Partners": Preferred, Full Line, and Standard. Standard Fabricators would be those who fabricated any Graber product. Full Line would be those who agreed to fabricate all available Graber products. Preferred would be those who agreed to fabricate the full Graber line, plus agreed to not fabricate or distribute any competitor's products unless otherwise agreed. Preferred fabricators would also be required to meet "minimum purchase and growth requirements." In exchange, Springs proposed that each preferred fabricator would receive benefits including participation in the "mega" price plan (a means of competing with generic brands), priority in introducing new products or components (that new products would be sold through preferred fabricators before other fabricators or the retail channel), and "[u]pon meeting qualifications, all

7

marketing and promotional benefits defined in the current year marketing program." To the latter benefit, Springs added the caveat "*Note*: Marketing plans may be modified periodically to reflect business condition[s]."

Hicks responded favorably to the Pilot Program concept, perceiving it to be a response to "Ray's Obsessions," the proposals he had expressed for years. On September 9, Springs sent Hicks a letter "to confirm the details of our Pilot Partnership Review." The letter listed various benefits of the "Joint Improvement Plan": (1) a margin improvement fund, whereby 2 ½% of Blind Maker's total monthly purchases would accrue as a credit that could be applied to purchases of certain components; (2) a 2% rebate available if Blind Maker maintained its 1997 purchase volume; (3) issuing 1% of monthly purchases to Blind Maker's co-op advertising fund; (4) a restricted marketing fund comprised of ½% of total purchases; (5) allowing Blind Maker to return full boxes of slow-moving inventory on a one-time basis, provided Blind Maker paid a restocking charge and purchased replacement inventory at 125% of the returned inventory's value; and (6) technical assistance from Springs and "recommendations to improve efficiency." Finally, the letter explained that "[o]ur intention is to run the pilot program until year end, and then roll out the new, complete program on 1-1-99." Hicks testified that Blind Maker participated in the pilot program and that Springs provided the promised benefits.

### The Orlando meeting and 1999 Marketing Plan

In mid-November, Jim Dudas, then-president of Springs, wrote Hicks, noting that "we are in the process of resetting our Distributor/Fabricator business," including "the formalization and strengthening of our relationship with our partners." That effort, Dudas wrote, included a

8

"Distributor/Fabricator agreement," a draft of which was enclosed, and an upcoming "Let's Make Magic" conference in Orlando, Florida, on December 9-12.

Twenty-four Graber fabricators attended the conference, including Blind Maker. A copy of a slide show from the conference, introduced by Blind Maker, states that the purpose of the conference was "to form a partnership [between Springs and invited fabricators] as we head into 1999." One of the listed expectations from the conference was to "begin process of formulating a real win/win partnership." The slide show indicates that the group discussed "[t]ri-suffocation of the retail environment" by "price deflation," "oversaturation," and "stagnant consumer demand." Springs's proposed response entailed "[c]onsolidation and growth of the strong" and "[s]hakeout of the weak" through strategies to distinguish and enhance the perception of the Graber brand and better position it in the retail environment. Aspects of these strategies included eliminating "channel conflicts" between Springs's Graber, Nanik and Bali brands; enhanced advertising; and the "Preferred Fabricator" program.

Springs presented an overview of the "Preferred Fabricator Program." There would be three levels of preferred fabricators, Gold, Silver, and Bronze. Under "the benefits of being a Preferred Fabricator," Springs listed:

- "Payment terms of 2% 15th, net 60." The parties agree that this phrase refers to a 2% early payment discount available if a party pays within fifteen days of invoice, with the full balance due on the 60th day after invoice.

- "Inventory adjustment program."

- "Co-op funds" (comprised of 2% for advertising, 1.5% for sales aids, and .5% for events, the latter being made available only to Gold preferred fabricators).

- Special discounts on pricing of certain components.

- "Margin improvement fund," whereby preferred fabricators would receive credits based on monthly purchases that could be applied toward future purchases. Gold preferred fabricators would receive 3%, Silver 2%, and Bronze 1%.

- "Performance growth rebate," whereby preferred fabricators would receive a rebate of 2% upon reaching quarterly targets for percentage growth in their purchases. Gold fabricators obtained the rebate upon meeting a 5% growth target, Silver 10%, and Bronze 15%.

- "Business productivity consulting," for Gold preferred fabricators only.

- "Preferred lead program," for Gold preferred fabricators only.

- "New product priority"—the ability to sell new Graber products before the products are made available to other fabricators or the retail channel—for Gold only.

Under "Preferred Fabricator Requirements," Springs explained that to participate, a fabricator had to execute, by March 31, the Springs FLA; agree to fabricate exclusively Graber products; and fabricate or distribute minimum levels of Graber product. Gold preferred fabricators were required meet minimum purchase requirements of at least $2.5 million and to have at least $25,000 of sales in each of six Graber product categories; Silver $1.5 million-$2.5 million in purchases and $15,000 in sales in each Graber product category; and Bronze $.5 million-$1.5 million in purchases and $5,000 in sales in each Graber product category.

Springs also reviewed the FLA, which Springs explained was aimed at maintaining and enhancing the reputation of its Graber trademarks. Springs emphasized that the FLA required fabricators to use only Graber components with the Graber products they sold and to conform to

Graber technical specifications. The "1999 Distributor/Fabricator Pricing Plan" was also presented, as was a description of Springs's planned 1999 training programs.

Blind Maker also introduced into evidence a booklet titled Springs's "1999 Marketing Program," which Hicks thought he received after the Orlando conference but before he signed the FLA. Under "Preferred Requirements" were listed the minimum purchase requirements discussed in Orlando, the exclusivity requirement (with the caveat that competitive products could be sold upon prior written approval from Springs), plus a requirement to:

> Execute and deliver to Springs . . . the [FLA] and strictly comply with all terms and conditions of this agreement. Our goal is to have the signed Agreement by January 1, 1999. If you are unable to sign the agreement by March 1, 1999, your company will be assigned into the Standard Category. In the event that the agreement is not signed by June 1, 1999, we will be forced to discontinue sales to your company.

Among the "preferred benefits," the 1999 Marketing Plan included:

- Fabrication and technical support;

- Business productivity consulting;

- Preferred lead program;

- New product priority;

- Payment terms of "2%, 15th, net 60 for all Preferred Fabricators;"

- An "Inventory Adjustment Program," whereby preferred fabricators could return certain unused inventory one time per year, contingent upon paying a restocking fee (lower for Gold preferred fabricators, higher for Silver and Bronze) and ordering new inventory at 125% of the value of the returned components;

- Co-op advertising, sales and event funds. All preferred fabricators would receive advertising funds equal to 2% of qualified purchases and sales funds

11

equal to 1.5% of qualified purchases. Gold preferred fabricators only would receive event funds equal to .5% of qualified purchases.

- A margin improvement fund, or monthly credit based on a percentage of a fabricator's volume of qualified purchases. The 1999 Marketing Plan explained that "[t]he primary objective of the Margin Improvement Fund is to improve overall profitability." Gold preferred fabricators would receive a 3% credit, Silver 2%, and Bronze 1%;

- Special discounts on components; and

- A performance growth rebate, which would reward preferred fabricators with a 2% rebate upon achieving specified percentage growth relative to prior year purchases. Gold preferred fabricators obtained the rebate upon achieving 5% growth, Silver 10%, and Bronze 15%.

Dudas later testified that Springs had "most definitely" intended for the blinds fabricators to rely on the statements made in the Orlando slide show and 1999 Marketing Plan as true. But, he clarified that those statements represented only Springs's "intentions" in its new preferred fabricator program.

Hicks later testified that Springs depicted its new initiatives as a means of reducing the number of fabricators with whom it dealt from the 60 to 80 it had been utilizing to approximately twenty. These "fortunate few" would receive "lots of benefits," including those mentioned above as well as other benefits that had been discussed during the pilot-program discussions, including new product development, a "good/better/best" brand positioning effort, a low-priced "fighter brand," "mega pricing," and use of Springs's equipment.[7] Blind Maker also introduced into evidence a document, prepared by Springs, representing Blind Maker's projected financial benefits if it participated in the preferred fabricator program at its 1999 projected volume of purchases. Adding

---

[7] Hicks characterized the benefits discussed in Orlando as essentially the same as those offered under the pilot program.

the projected financial benefits from the new co-op advertising programs, margin enhancement fund, and the performance growth rebate yielded an estimated financial benefit of over $1.5 million. The document also compared these benefits to those Blind Maker had received under Springs's 1998 incentive programs, and represented that Springs stood to gain more than $1.1 million in additional benefits.

### Evidence of a link to Project Overlord

Following the Orlando conference, an internal Springs operations review analyzed fabricator feedback from the event. The review listed a number of the fabricators' concerns including, (1) questions regarding Springs's ability to deliver the promises made, (2) quality and service issues, (3) belief that the FLA was lopsided in Springs's favor, and (4) concerns about Springs's strategy to acquire [distributor/fabricators] and establish wholly owned fabrication capability. At the end of this list, the review states "*** We will be driven to execute OVERLORD on an accelerated basis."

### Hicks signs the FLA

Hicks did not sign the FLA at the Orlando conference. Springs mailed a revised version of the agreement to Blind Maker on January 7, 1999. Springs had made several revisions based on "the significant comments that were obtained in Orlando" in order to "make the Agreement completely serviceable to [Springs] and it's [sic] fabricating partners." The letter stated "a timetable for completion of the Agreement":

13

| | |
|---|---|
| January 1999 - March 1999 | Signed Agreements are obtained and applicable benefits (Gold, Silver and Bronze Preferred Fabricators) begin to accrue the month following the signature. |
| March 2, 1999 | Fabricators not signing the Agreement will be classified as Standard Fabricators. |
| June 1, 1999 | Fabricators who have not signed the Agreement will be discontinued by their election of not signing the Agreement. |

After consulting with Blind Maker's corporate counsel, Hicks signed the revised FLA on January 15, 1999.

The FLA itself made no mention of the Preferred Benefits discussed in Orlando or in the 1999 Marketing Plan. It did grant Blind Maker a "non-exclusive right and license" to use certain of Springs's Graber trademarks listed in an exhibit to the agreement. The license permitted Blind Maker to use the trademarks within identified territory and distribution channels. Blind Maker agreed "to devote its best efforts to promote and sell the Licensed Product in the Primary Territory" and that all Licensed Products would utilize only Springs components and be installed and constructed in conformity with technical information and specifications provided by Springs. Springs was also given power to approve any advertising for the Licensed Products.

Springs agreed, during the term of the agreement, to sell to Blind Maker all components for fabrication of the Licensed Products, subject to its right to decline any order. The agreement further provides that, "The prices and other terms and conditions of sale for the components are set forth in Springs's price lists and standard terms and conditions of sale," and that

"Springs reserves the right to change prices and standard terms and conditions of sale and the features of its components at any time during the terms of this Agreement." Additionally, the FLA provided that "[a]ll orders shall be subject to the approval of Springs's credit department." The FLA also obligated Springs to sell "sufficient quantities of samples and displays of the Licensed Products, catalogs, and other advertising and promotional aids," and to make available, from time to time, fabricator technical information, including finished product specifications, fabrication and assembly instructions, and repair instructions.

The FLA also permitted either party to terminate the agreement, with or without cause, upon six months' advance written notice. Upon termination, Blind Maker's license to use Springs's trademarks and technical information would cease.

The sole reference in the FLA to the Preferred Fabricator program was in section 13.01, which provided:

> Springs Fabricators are classified as Preferred (Gold, Silver, or Bronze) or Standard Distributor/Fabricator. Fabricator agrees to strictly comply with all requirements for its assigned category . . . . The requirements are subject to quarterly review and revision. Fabricator shall provide quarterly reports of its compliance status with respect to all performance targets assigned to Fabricator.

The FLA contained an addendum identifying Blind Maker as a Gold Preferred Fabricator and setting forth the requirements that Blind Maker purchase a total of at least $2.5 million of qualifying products and at least $25,000 from each Graber product group; fabricate and distribute only Springs products unless Blind Maker obtained written approval to do otherwise; and meet a $12.3 million sales objective. Payment terms were again specified as "2% 15th, Net 60."

15

The FLA further provided that Springs would have a right of first refusal should Hicks sell the Blind Maker. However, Hicks handwrote a modification: "Springs shall not have a right of first refusal if ownership is transferred in accordance with a will to family members."

Finally, section 15.05 of the FLA provided:

> This Agreement contains the entire agreement between the parties hereto in respect of the subject matter hereof, and supercedes and cancels all previous agreements, negotiations, commitments and understandings, with respect to the subject matter hereof, whether made orally or in writing.

After Hicks executed the FLA and forwarded it to Springs, Dudas wrote on January 22 to acknowledge receipt and "welcome you to our joint partnership." Dudas added that "[s]ince your signing date was January, 1999, the Preferred benefits will begin on February 1, 1999. These benefits will be distributed as per our 1999 Fabricator publication and our discussions in Orlando."

Hicks later testified that, although the FLA and other Springs documentation had referenced "Standard Fabricators," Springs executives had "repeatedly" told him that Blind Maker had to sign the FLA *as a preferred fabricator—i.e.*, to agree to the exclusivity requirement and preferred fabricator performance targets—or Springs would discontinue all business with Blind Maker on June 1, 1999. Hicks later learned that, in fact, Springs had continued to do business with other fabricators as standard fabricators. He testified that if he had understood that Blind Maker could have continued to do business with Springs as a standard fabricator, he would not have signed the FLA as a preferred fabricator. Hicks also testified as to his understanding at the time that the FLA and the preferred fabricator benefits "went together" and that if he had believed that Springs

16

would not consider itself bound to provide the preferred fabricator benefits, he would not have signed the FLA as a preferred fabricator.

**Springs enforces the terms of the FLA**

The dispute that ensued stemmed from Springs's attempts to enforce FLA terms that departed from the parties' past business practices, Springs's modification of certain preferred fabricator benefits, and Springs's failure to deliver certain benefits as originally promised. Initially, Blind Maker received at least some of the preferred fabricator benefits represented in the 1999 Marketing Plan and prior discussions. Particularly important to Blind Maker was the 3% margin improvement fund. Also, even though the preferred fabricator requirements explicitly stated payment terms of "2% 15, net 60," Blind Maker continued its practice of taking 2% early payment discounts even when it paid significantly later than fifteen days after invoice. However, Springs was slower to deliver on other preferred fabricator benefits, raised some component prices, and eliminated a truckload discount that Blind Maker had received prior to 1999.

In April 1999, Hicks learned that Springs was selling a new type of Graber product through Home Depot. Hicks faxed a letter to Dudas complaining that the action "speaks volumes" about Springs's retail strategy and "it raises serious issues of integrity."[8] Hicks also urged that he "signed this contract expecting a 'fighter brand.' Where is it? Instead we are taking a significant price increase on our basic components." He added, "We should not be penalized for signing a contract or being loyal to Graber. We must have access to competitively priced components on those

---

[8] Hicks added, "Jim, I am not questioning your personal integrity, but your company's marketing integrity is certainly in question."

17

generic, commodity products." Hicks also expressed concern that, "I also signed the contract expecting significant savings from your preferred programs. Between the price increase, losing the truckload discount, and the other perks, The Blind Maker is not doing well." Hicks later testified that this was the first time he began to question Springs's commitment to the promises he believed it had made in Orlando.

On May 29, 1999, Hicks executed a second revised version of the FLA. This version included a narrower right of first refusal provision applying only where an owner attempted to sell a fabricator to one of Springs's direct or indirect competitors. The agreement was otherwise identical to the version Hicks had signed in January except for some changes to the exhibits. The exhibit addressing Blind Maker's obligations as a Gold preferred fabricator was unchanged.

Beginning in June, Springs's credit department began to inquire with Blind Maker regarding its practice of taking the 2% early payment discount even while paying significantly later that the fifteen days after invoice specified in the FLA. These discussions culminated in a September 29 conference call in which Springs informed Blind Maker that it would strictly enforce the "2% 15th, net 60" payment terms specified in the FLA.[9] In Hicks's view, due to Blind Maker's cash cycle on inventory, this step eliminated any possibility it could obtain the 2% discount, effectively adding what Hicks estimated to be $25,000 or $30,000 per month to the company's inventory costs.

Relations between the two companies continued to sour thereafter. After a meeting with a Springs marketing executive that Hicks later recounted "created some animosity," Dudas

_____

[9] Springs also sought reimbursement from Blind Maker for discounts it improperly took between June 1 and September 29. This aspect of the parties' dispute, which escalated in the succeeding months, was ultimately resolved before trial.

18

informed Hicks that, as Hicks recounted, "I basically wasn't liked at Springs . . . was considered to be leading a charge against them," and that his "issues were mine and mine alone." Dudas, according to Hicks, concluded by suggesting that Hicks "should consider my options, one of which was for Springs to buy The Blind Maker." This was the first time that Hicks had heard such an idea from a Springs executive, and Hicks recounted that he felt "shocked and threatened that they even would consider a strategy like that."

Dudas subsequently left Springs some time thereafter, and, on October 22, 1999, Dudas wrote Hicks thanking him for "your support," and professing, "I know I have failed to deliver all that was promised at the outset of my tenure, but I do believe that we have made progress and that the current business direction is correct."

**The white sale**

There is evidence that, during 1999, there was awareness within Springs that Blind Maker was encountering financial difficulties. An October email from Springs's credit manager related an industry rumor that Blind Maker's bank had begun carefully scrutinizing Blind Maker's account balances and sending auditors twice monthly to do inventory verification. The email concluded that the rumors were only speculation, "but given the concerns we have, I feel it is worth documenting. We should also be wary of any large orders that may potentially be placed by [Blind Maker] to make their 'quotas.'" Other internal documents reflected concern that Blind Maker's accounts payable had swelled and had become late since Springs began strictly enforcing the fifteen-day requirement for the 2% early payment discount. Testimony from Springs employees further revealed that Springs had an internal "credit limit" for Blind Maker of $3.8 million and that Blind

19

Maker had approached or exceeded this limit for much of the latter half of 1999. Blind Maker was not informed of any such limit, however, until several months later.

In November, Blind Maker received a Graber "General Sales Bulletin," addressed to "Graber Preferred Distributor/Fabricators," announcing a "First Quarter 2000 White Sale" through which preferred fabricators could obtain steep discounts on large purchases of certain Graber components. Hicks testified that, having "lost" its customary 2% early payment discount, Blind Maker "bought as much as we could"—over $1 million more in inventory than in a typical month—both to avail itself of the white sale discounts and to meet the 5% growth target for receiving the preferred fabricator benefits' 2% performance growth rebate. Blind Maker's accounts payable rose to over $4.8 million by January 8, 2000.

Hicks testified that Springs thereafter began putting unprecedented pressure on Blind Maker to pay down its debt. Later in January, Springs reduced Blind Maker's internal "credit limit" from $3.85 million to $3.4 million. It did not inform Blind Maker of this reduction or the existence of a credit limit. Blind Maker ultimately agreed to a repayment schedule.

**Changes to the preferred fabricator benefits**

In March 2000, Springs held a meeting of its Preferred Fabricators in Chicago, at which it announced changes in its preferred benefits for 2000. Springs replaced the margin enhancement fund, which had been based solely on the volume of a fabricator's purchases, with a "Business Development Fund," which provided rebates tied to growth in purchase volume.[10] Springs

---

[10] In all classifications, a fabricator had to achieve a minimum of 5% growth. For meeting this threshold, a Gold fabricator would receive a 3% rebate, a Silver 2%, and a Bronze 1%. For the

also modified the performance growth rebate to provide graduated percentages of rebates based not on fabricator classification, but percentage growth.[11] These shifts to growth-based incentives from volume-based incentives created new difficulties for Blind Maker; because it was already a large fabricator, it regarded the required growth thresholds as virtually impossible to achieve. However, Blind Maker apparently did qualify for a new "Platinum" classification of preferred fabricators applicable to those with at least $5 million in annual purchases. These changes took effect on April 1.

**The "customer list"**

At the March meeting, Springs also introduced a new promotional program, "Clear to the TOP," through which fabricators' retail-level customers could obtain certain benefits, such as free merchandise, based on growth in their purchases of Graber products. Blind Maker and other fabricators were asked to mail "Clear to the TOP" program registration cards to their retail-level customers. The cards requested confidential past-sales data, including customer identities, addresses, telephone numbers, social security numbers or employer identification numbers, as well as sales histories. Blind Maker considered this "very confidential information," and voiced concern to Springs. Springs represented that this information would be kept confidential—it would not be used by Springs but would be forwarded to a third-party administrator; only names, social security numbers and addresses for IRS purposes would be given to Springs. Springs would not have the

---

new Platinum classification, discussed above, Springs would pay a 4% rebate.

[11] For 5-10% growth, all classifications of preferred fabricators would receive a 1% rebate; 11-14% growth, 2% rebate; and 15% or more growth would yield a 3% rebate.

sales history information. Springs also purportedly represented that only the third-party administrator would have access to the sensitive information and that Springs was using this arrangement so fabricators would not have to disclose their confidential information to Springs.

**Blind Maker gives notice to terminate**

On May 19, 2000, Blind Maker sent Springs a letter terminating the FLA effective six months later, November 19, 2000, as required by that agreement. Hicks later explained that Springs had eliminated any benefit for Blind Maker to continue as a preferred fabricator.

An internal Springs briefing paper prepared for Springs president Ron Zabel lists several potential "choices" that "should be presented to Ray Hicks no later than 5/26/00." Among these were Springs acquiring an equity position in Blind Maker. However, Hicks later testified that Springs did not offer that option. Subsequently, on July 6, Springs placed a "credit hold" on Blind Maker's purchases for the first time. Springs witnesses later testified that Blind Maker's termination notice was a factor in this decision. On July 13, Springs informed Blind Maker for the first time about its internal credit limit. Hicks testified that credit holds were "constant" thereafter and that Springs frequently informed Blind Maker that requested components were on back order when, Hicks maintains, other fabricators were able to purchase the same components. There was also evidence that Springs refused to complete warranty work submitted by Blind Maker at this time.

Blind Maker and Springs attempted to negotiate the extent to which Blind Maker could sell products from rival manufacturers during the remaining term of the FLA and whether Springs could compete for Blind Maker's retail-level customers. The evidence is disputed as to whether the parties ever reached any agreement.

**Project Texas**

Also in July, Springs executives began actively developing alternative channels through which Springs could reach the Texas market. Springs formulated a plan, "Project Texas," for pursuing Blind Maker's customers. An internal Springs memo circulated around this time by Springs's new president, Ron Zabel, questioned whether Blind Maker should have a "hard" or "soft" landing following its notice of termination. Another internal Springs document lists two scenarios to be presented to Blind Maker. Scenario 1 listed a variety of options for the continued relationship between the two companies. This included (a) Spring's buyback of existing inventory and increasing Blind Maker's margin, (b) voiding the FLA and allowing Blind Maker to fabricate under its own brand, or (c) an exchange of debt for equity in which Springs would actively participate in the operation of Blind Maker. Scenario 2 contemplated Blind Maker's demise: "SWF will implement actions to insure payment of the outstanding amount ($4.1M) SWF will take action(s) to maintain sales of its products in the markets formerly served by TBM." A document entitled "Ray, we want you back!!" also reflects the hard or soft landing strategy. This document lays out a number of inducements for the Blind Maker to return as a Springs fabricator and states that, if Blind Maker does not agree within 24 hours, Springs will demand repayment of all accounts receivable within 60 days, cancel all pending and future orders, and "[Springs] will immediately deploy appropriate resources to enable it to penetrate all markets now being served by Blind Maker."

There is evidence that, by September, Springs was using the confidential customer information from the "Clear to the TOP" promotion to compete directly for Blind Maker's retail-level customers. There is also evidence that Springs provided this information to rival fabricators

23

to enable them to compete for Blind Maker's customers. At trial, Springs's CFO conceded that he had believed it was wrong for Springs to use the confidential customer information in that manner.

At this point in their relationship, Springs began refusing to accept unopened inventory that Blind Maker was attempting to return.

**The lawsuit**

On September 29, 2000, Blind Maker filed suit against Springs in Travis County district court, claiming fraud, breach of contract, negligence, negligent misrepresentation, misappropriation of trade secrets, tortious interference with business relations, promissory estoppel, and claims under the Texas Deceptive Trade Practice Act and the Wisconsin Fair Dealership Act. Springs counterclaimed under the FLA for $2.3 million, Blind Maker's remaining credit balance. Against this counterclaim, Blind Maker asserted various defenses, including that it was fraudulently induced into the FLA.

The case was tried to a jury. Although the jury heard evidence relevant to all of Blind Maker's liability claims, before submission Blind Maker dismissed with prejudice all of its claims except fraud. As for damages, Blind Maker submitted only past and future "Lost Profits that were natural, probable, and foreseeable consequence of Springs's fraud." The jury found that Springs had committed fraud, and awarded Blind Maker $5,157,240 in past lost profits; it awarded no future lost profits. The jury further found by clear and convincing evidence that the harm to Blind Maker resulted from fraud, and awarded $2,090,000 in exemplary damages. However, the jury also found that Blind Maker failed to comply with its payment obligations under the FLA and that such failure was not excused by either of two counterclaim defenses Blind Maker submitted to the

jury—fraudulent inducement or anticipatory breach. The jury awarded Springs $2,043,660 in damages. Only Springs now appeals.

## DISCUSSION

Springs raises four primary issues on appeal: (1) the jury's finding of fraud is not supported by legally or factually sufficient evidence; (2) the jury's actual-damage award is not supported by legally or factually sufficient evidence; (3) because its liability finding and actual-damage award are not supported by the evidence, the jury's exemplary-damage predicate finding and award should likewise be overturned; and (4) in the alternative, the judgment must be reformed to award post-judgment interest accruing after September 1, 2003 at the rate of 5% rather that 10%.

## The jury's fraud finding

In its first issue, Springs challenges the legal and factual sufficiency of the evidence to support the jury's finding of fraud.

### *Standard of review*

In reviewing the legal sufficiency of the evidence, we view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). There is legally insufficient evidence or "no evidence" of a vital fact when (a) there is a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the

opposite of the vital fact. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997); *Patlyek v. Brittain*, 149 S.W.3d 781, 785 (Tex. App.—Austin 2004, pet. denied). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Havner*, 953 S.W.2d at 711 (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995)). If the evidence is so weak as to do no more than create a mere surmise or suspicion of its existence, its legal effect is that it is no evidence. *Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 183 (Tex. 1995).

In reviewing a factual insufficiency point, we consider, weigh, and examine all the evidence presented at trial. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We set aside a finding for factual insufficiency only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

### *Overview of the jury charge and evidence*

The starting point for our analysis of Springs's evidentiary sufficiency challenge is the charge as submitted to the jury. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (legal sufficiency); *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 762 (Tex. 2003) ("Before a court can properly conduct a factual sufficiency review, it must first have a clear understanding of the evidence that is pertinent to its inquiry. The starting point generally is the charge and instructions to the jury."); *Ancira Enters., Inc. v. Fischer*, No. 03-03-00498-CV, 2005 Tex. App. LEXIS 4708, at *23-24 (Tex. App.—Austin June 16, 2005, no pet. h.). The focus of our inquiry, then, is Question

1, in which the jury was asked, "Did Springs commit fraud against The Blind Maker?" The jury was instructed that "fraud can occur through either: (1) misrepresentation; or (2) failure to disclose," and then proceeded to list the elements of both forms of fraud:

1. Fraud by misrepresentation occurs when—

   a.   a party makes a material misrepresentation;

   b.   the misrepresentation is made with the knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion;

   c.   the misrepresentation is made with the intention that it should be acted on by the other party; and

   d.   the other party acts in reliance on the misrepresentation and thereby suffers injury.

   "Misrepresentation" means:

   a.   A false statement of fact;

        OR

   b    A promise of future performance made with an intent, at the time the promise was made, not to perform as promised.[12]

2. Fraud by failure to disclose occurs when–

   a.   a party fails to disclose a material fact within the knowledge of that party,

   b.   the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth,

---

[12]   Springs does not dispute that this is a proper instruction regarding fraud by misrepresentation. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001).

    c.    the party intends to induce the other party to take some action by failing to disclose the fact, and

    d.    the other party suffers injury as a result of acting without knowledge of the undisclosed fact.[13]

The jury answered Question 1 in the affirmative.

The gist of Blind Maker's fraud claim was that Springs committed a series of independently actionable fraudulent acts to effectuate the "Overlord" plan. Blind Maker alleged the following specific fraudulent acts:

- Fraudulently inducing Blind Maker to enter into the FLA, which Blind Maker contends effectively trapped the company in an agreement that required Blind Maker to sell exclusively Graber products and allowed termination only by six-months' advance notice (the "fraudulent-inducement" theory);

- Fraudulently failing to disclose to Blind Maker that it was in danger of exceeding Springs's "secret" credit limits before allowing it to make large credit purchases in connection with the December 1999 white sale promotion (the "white sale" theory);

- Fraudulently misrepresenting that Blind Maker's customer list information collected through the "Clear to the TOP" promotion would be kept confidential, then using it to compete against Blind Maker a few months later (the "customer list" theory);

- Fraudulently failing to disclose that, after Blind Maker gave notice to terminate the FLA, Springs would (1) place a credit hold on its purchases; (2) treat it "differently" than other preferred fabricators; (3) refuse to do business with it as a standard fabricator; (4) use the customer information obtained through the Clear to the TOP promotion to compete against it; and (5) make false statements

---

[13] As discussed below, Springs objected to the submission of an instruction on fraud by failure to disclose, contending that, as a matter of law, such a claim was foreclosed because it owed no duty to disclose and because Blind Maker did not obtain a predicate finding on the existence of such a duty. We address this contention below.

to Blind Maker's customers concerning why Blind Maker was no longer selling Springs's products (the "termination" theory).

### Fraudulent inducement theory

In support of its fraudulent inducement theory, Blind Maker elicited the following evidence of representations or nondisclosures by Springs before Hicks signed the FLA:

- Hicks testified that Springs "repeatedly" told him that Blind Maker would have to sign the FLA as a preferred fabricator by June 1, 1999, or Springs would cease to do business with Blind Maker. Hicks also testified that Springs never told him that he could opt to continue doing business as a standard fabricator, as he later learned that Skandia, one of Blind Maker's competitors, did;

- Hicks testified that he was never told that the 3% margin development discount could change or would be changed in March 2000;

- Hicks testified that he was never told that Springs would strictly enforce the 2% early payment discount for payment within fifteen days of invoice;

- Hicks testified that Springs's expressed intentions with the FLA and preferred fabricator program was to eliminate "bottom feeders;"

- Hicks testified that he was never told about "Overlord" or that Blind Maker was a target;

- Evidence regarding the preferred fabricator benefits represented to Hicks during the Orlando conference and in the 1999 Marketing Plan. These included (i) new product development; (ii) new product priority (distributor/fabricators would be able to sell new products for a year before it went into the retail channel); (iii) Nanik blinds would not be sold in the retail channel (so as to avoid channel conflicts); (iv) a lower-priced "fighter brand" would be developed and deployed, as well as "good-better-best" product positioning; (v) price parity between the distributor/fabricator channel and the retail channel; (vi) a "mega pricing" program to combat low-priced generics; (vii) smaller, cheaper samples; and

29

(viii) pull national consumer advertising.[14] Blind Maker also claims that Springs misrepresented that these benefits and FLA "went together as a whole." Hicks testified that he wouldn't have signed the FLA as a preferred fabricator if these benefits had not been promised and that Springs failed to fulfill each represented benefit;[15] and

- Hicks testified that Springs never told him that it viewed its representations regarding the preferred fabricator benefits as mere business "intentions" and not as firm commitments.

Springs contends that none of this evidence can have probative value because of the operation of various legal rules. *See Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) (legal sufficiency or "no evidence" point will be sustained when court is barred by rules of law or of evidence from giving weight to only evidence offered to prove a vital fact); *Havner*, 953 S.W.2d at 711.

*The jury's failure to find fraudulent inducement in Question 6*

Springs's first argument is predicated on the jury's failure to find in Blind Maker's favor on its fraudulent-inducement defense to Springs's counterclaim under the FLA. Question 6 of the charge, presenting Blind Maker's affirmative defenses, asked, "Was The Blind Maker's failure to comply [with the FLA] excused," and included an instruction regarding two defenses:

---

[14] Blind Maker also asserts that its "termination claims" are, in part, fraudulent inducement claims, because Springs should have disclosed, before Blind Maker entered into the FLA, the actions Springs would ultimately take after Blind Maker gave notice to terminate sixteen months later. We address this aspect of Blind Maker's fraudulent inducement claim in our discussion of the termination theory.

[15] We also note that Dudas's farewell letter to Hicks conceded his failure "to deliver all that was promised at the outset of my tenure."

[F]ailure to comply by The Blind Maker is excused if any one of the following is true:

Failure to comply by The Blind Maker is excused by Springs's previous failure to comply with a material obligation of the [FLA]; or

Failure to comply by The Blind Maker is excused if The Blind Maker entered into the [FLA] as a result of fraud, if any, by Springs.

The question then explicitly linked the term "fraud" in Question 6 to the definitions and instructions accompanying Question 1: "Please refer to Question 1 for instructions on fraud." The jury answered "no" to Question 6. Because the two defenses were submitted in the disjunctive, the jury necessarily failed to find either fraudulent inducement or anticipatory breach.

Springs reasons that because the jury failed to find in Question 6 that Blind Maker was fraudulently induced into the FLA, the jury necessarily could not have relied on evidence of fraudulent inducement in finding *some* fraud in Question 1. It extrapolates that, in our sufficiency review, we must consider only potential evidence of fraud that is not "inducement-related." Blind Maker assails this argument on two chief grounds. It first cites the proposition that a jury's failure to find in favor of a party on an issue is not an affirmative finding to the contrary but merely indicates that the party failed to carry its burden of proving that fact. *See C. & R. Transp., Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex. 1966); *Gensco v. Canco Equip. Inc.*, 737 S.W.2d 345, 347-48 (Tex. App.—Amarillo 1987, no writ).[16] Second, Blind Maker suggests that Springs is attempting

---

[16] *See VandeStreek v. Hammer*, No. 03-99-00355-CV, 2000 Tex. App. LEXIS 4588, at *2-3 (Tex. App.—Austin 2000, no pet.) (memorandum opinion); *but see Doyle Wilson Homebuilder, Inc. v. Pickens*, 996 S.W.2d 387, 399 (Tex. App.—Austin 1999, pet. dism'd by agr.) (characterizing jury's negative answer to breach of contract submission as "an implicit finding that the electrical wiring used . . . was of good quality and free of defects, since any materials not in conformity were

to revive an argument, waived at trial, that the jury's findings in Questions 1 and 6 fatally conflict.[17]

We agree that Springs has waived the argument it attempts to assert here.

In the district court, Springs argued that the jury's responses in Questions 1 and 6 fatally conflicted and rejected the possibility that the responses could be reconciled.[18] Blind Maker maintained that (1) Springs waived its conflict complaint by failing to object before the jury was discharged; and (2) while conceding "there is some overlap in the facts inquired about," the two responses could be reconciled because Question 1 inquired about additional acts of fraud beyond Blind Maker's fraudulent inducement into the FLA. On appeal, Springs does not attempt to argue conflict and does not appear to dispute that it waived that argument; instead, it purports to adopt Blind Maker's position at trial that the responses could be reconciled and additionally attempts to derive implications for our sufficiency review of the Question 1 finding.

---

considered defective under the contract"; although finding was "not conclusive," it "indicates that the jury did not believe that either a manufacturing defect or improper installation . . . caused the fire.").

[17] Both affirmative jury findings and failures to find may give rise to fatal conflicts under Texas law. *See Bender v. Southern Pac. Transp. Co.*, 600 S.W.2d 257, 260 (Tex. 1980); *Ford Motor Co. v. Miles*, 141 S.W.3d 309, 316-19 (Tex. App.—Dallas 2004, pet. filed) (negative finding on strict liability issue fatally conflicted with affirmative finding on negligence issue, requiring reversal and remand for new trial); *see generally* 4 Roy W. McDonald & Elaine A. Grafton Carlson, *Texas Civil Practice* §§ 25:11-:13 (2d ed. 2001) (citing cases involving jury failures to find in discussion of conflicting findings).

[18] In both its motion for new trial and its motion to disregard jury findings and for judgment, for example, Springs posited that if Blind Maker "had alleged and/or proved a misrepresentation that it relied upon in some way other than entering into the F&L Agreement, the two answers might not contradict each other," but it rejected this possibility because the jury had awarded an amount for fraud damages in Question 2 that exceeded any amount it believed was attributable to any non-inducement fraud.

The unstated premise underlying Springs's argument on appeal is that the jury's responses in Questions 1 and 6 would conflict unless we reconcile the two by construing the jury's Question 1 finding to be based solely upon evidence of fraud other than fraudulent inducement. This is the type of analysis that Texas courts perform when a conflict complaint is raised. *See*, *e.g,* *Bender v. Southern Pac. Transp. Co.*, 600 S.W.2d 257, 260 (Tex. 1980) (reconciling jury's liability findings on certain issues with failures to find on other issues). Absent a conflict complaint, there is no basis for reconciling the jury's responses, and the court must give effect to each finding in the ordinary fashion. *See id.* A conflict objection can be waived. *St. Paul Fire & Marine Ins. Co. v. Murphree*, 357 S.W.2d 744, 748-49 (Tex. 1962) (rendering of judgment on fatally conflicting findings is not fundamental error and can be waived).[19] Especially in the face of general principles of sufficiency review, which require us to consider *all* of the evidence in light of the charge *actually submitted*, we decline to reconcile the jury's responses in Questions 1 and 6, much less rely on such reconciliation to limit our sufficiency review, because Springs did not first preserve a conflict objection at trial. *See Associated Indem. Corp.*, 964 S.W.2d at 285-86; *Plas-Tex*, 772 S.W.2d at 445. To hold otherwise would create an end-run around the modern error preservation requirement that parties object to conflicting jury findings before the jury is discharged[20] and the sound policies that

[19] *Cf. Golden Eagle Archery Co. v. Jackson*, 116 S.W.3d 757, 763-70 (Tex. 2003) (absent contrary instructions in charge or other limitations, jury might award overlapping or duplicative elements of damages based on same evidence).

[20] *See Columbia Med. Ctr. of Las Colinas v. Bush*, 122 S.W.3d 835, 861 (Tex. App.—Fort Worth 2003, pet. denied); *Norwest Mortgage, Inc. v. Salinas*, 999 S.W.2d 846, 865 (Tex. App.—Corpus Christi 1999, pet. denied); *City of Port Isabel v. Shiba*, 976 S.W.2d 856, 860 (Tex. App.—Corpus Christi 1998, pet. denied); *Isern v. Watson*, 942 S.W.2d 186, 191 (Tex. App.—Beaumont 1997, writ denied); *Ciba-Geigy Corp. v. Stephens*, 871 S.W.2d 317, 324 (Tex. App.—Eastland 1994, writ denied); *see also* Tex. R. Civ. P. 295 (contemplating that trial court can

underlie that requirement. What the jury intended by findings that potentially conflict is best determined by the jury itself, a procedure made available by timely objection before the jury is discharged, *see* Tex. R. Civ. P. 295, rather than by appellate courts drawing "speculative" conclusions regarding "the jury's thought processes or of its intentions in giving its answers to the two issues," as Springs asks us to do here. *C. & R. Transp.*, 406 S.W.2d at 195.

We accordingly hold that Springs waived its argument that the jury's failure to find in Blind Maker's favor regarding its fraudulent inducement defense limits the scope of our sufficiency review of the jury's Question 1 fraud finding.[21]

### *"Con-tort" cases*

Next, Springs contends that Blind Maker's fraudulent-inducement claim is, in substance, a claim for damages from Springs's failure to perform under the FLA, and thus can be brought only as a contract claim. *See Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494-95 (Tex. 1991).

In *DeLanney*, the supreme court held that a cause of action for "negligence" could not be based on an allegation that a party failed to perform duties subsumed in a contract because

---

return conflicting verdict to jury with instructions).

We note that, in some of its older decisions, the supreme court addressed issues of conflict raised for the first time on appeal. *C. & R. Transp., Inc. v. Campbell*, 406 S.W.2d 191, 195 (Tex. 1966) (addressing conflict "although neither party so contends or has sought a mistrial on that ground."). Because Springs does not dispute that it waived its conflict objection at trial, we need not consider the implications, if any, of these decisions.

[21] Because we rely on waiver, we have no occasion to consider whether, assuming we could properly reconcile the responses in Questions 1 and 6 in the manner Springs suggest, it would have any implications for our sufficiency review.

such an action sounded in contract and not tort. *Id*. at 494-95; *see also Crawford v. Ace Signs, Inc.*, 917 S.W.2d 12, 13-14 (Tex. 1996) (extending *DeLanney* to hold that nonperformance of contract not actionable under DTPA). Subsequently, in *Formosa Plastics Corp., USA v. Presidio Eng. & Contr., Inc.*, 960 S.W.2d 41, 46-47 (Tex. 1998), the supreme court rejected the application of *DeLanney* to preclude a fraudulent-inducement claim. The court noted that Texas law has long imposed a tort duty, independent of any contract, to abstain from inducing another to enter into a contract through the use of fraud. *Id*. at 46 (citing *Prudential Ins. Co. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 162 (Tex. 1995), and *Dallas Farm Mach. Co. v. Reaves*, 307 S.W.2d 233, 239 (Tex. 1957)). It likewise noted that it had "repeatedly recognized that a fraud claim could be based on a promise made with no intention of performing, irrespective of whether the promise is later subsumed in a contract." *Id*. (citing *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp*., 823 S.W.2d 591, 597 (Tex. 1992)). It also established that tort damages are not precluded simply because a fraudulent representation causes only an economic loss. *Id*. at 47. "Accordingly," the supreme court held, "tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract." *Id*.

To distinguish *Formosa*, Springs relies on the jury's failure to find fraudulent inducement in Question 6, which it equates to a finding of no fraudulent inducement. "This is a misinterpretation of the issue and the answer." *C. & R. Transp.*, 406 S.W.2d at 194. The jury's *failure to find* fraudulent inducement in Question 6 is not an affirmative finding of *no* fraudulent inducement. *Id.* In light of this principle, and Springs's waiver of any conflict-related complaint

35

relating to the jury's consideration of fraudulent inducement evidence in finding fraud in Question 1, we must reject Springs's attempt to use the Question 6 finding to avoid *Formosa*. Assuming there is otherwise competent evidence of fraudulent inducement, *DeLanney* does not stand as a barrier to our considering that evidence as support for the jury's Question 1 fraud finding. *Formosa*, 960 S.W.2d at 47.

*Merger clause*

In section 15.05 of the FLA, Blind Maker contractually agreed that (1) the FLA "contains the entire agreement" between it and Springs "with respect to the subject matter hereof"; and that the FLA (2) "supersedes and cancels all previous agreements, negotiations, commitments and understandings, with respect to the subject matter hereof, whether made orally or in writing." Springs contends that section 15.05 negates, as a matter of law, the reliance element of Blind Maker's fraud claim to the extent it arose before Hicks's entry into the FLA; *i.e.*, its fraudulent inducement theory. *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179-80 (Tex. 1997) (disclaimer provision in settlement agreement defeated fraudulent inducement claim by negating reliance on pre-contractual representations); *Prudential*, 896 S.W.2d at 162 ("as is" clause and disclaimer of reliance negated reliance element of fraud claim predicated on pre-contractual representations).

Blind Maker attempts to distinguish section 15.05 from the type of contractual provisions addressed in *Schlumberger* and *Prudential*. It points out that *Schlumberger* involved a disclaimer of reliance in a settlement release, *see Schlumberger*, 995 S.W.2d at 177-80, while *Prudential* involved a contractual "as is" clause and disclaimer of reliance in a real estate purchase

agreement. *See Prudential*, 896 S.W.2d at 160. Blind Maker observes that section 15.05 is a merger

or integration clause, and maintains that it can only prevent the use of parol evidence to vary the

written terms of the FLA and does not bar tort claims. We reject Blind Maker's argument.

In general, a "merger clause" is a contractual provision to the effect that the written

terms of the contract may not be varied by prior agreements because all such agreements have been

merged into the written document. *IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113, 125 n.6

(Tex. App.—Houston [14th Dist.] 2003, pet. denied) (citing Black's Law Dictionary 989 (6th ed.

1990)). Such clauses emphasize the parties' intent to invoke the "merger doctrine." *Fish v. Tandy

Corp.*, 948 S.W.2d 886, 899 (Tex. App.—Fort Worth 1997, pet. denied) ("A written merger clause

. . . is essentially a memorialization of the merger doctrine."). Under the merger doctrine, prior or

contemporaneous agreements between the same parties, concerning the same subject matter, are

absorbed into a subsequent agreement. *See Texas A & M Univ.-Kingsville v. Lawson*, 127 S.W.3d

866, 872 (Tex. App.—Austin 2004, pet. filed); *Fish*, 948 S.W.2d at 898; *see generally Hubacek v.

Ennis State Bank*, 317 S.W.2d 30, 31 (Tex. 1958) (explaining merger rule). Whether merger occurs

depends on the intent of the parties. *Lawson*, 127 S.W.3d at 872; *Fish*, 948 S.W.2d at 898. The

merger doctrine is an adjunct of the parol-evidence rule. *Lawson*, 127 S.W.3d at 872. For these

reasons, at least one of our sister courts has suggested that merger clauses operate solely to bar

contract claims based on extra-contractual agreements or representations, and not torts. *See

Carousel's Creamery, L.L.C. v. Marble Slab Creamery, Inc.*, 134 S.W.3d 385, 395 (Tex.

App.—Houston [1st Dist.] 2004, pet. filed).

However, the supreme court in *Schlumberger* implied that merger clauses could, under circumstances like those present in that case, operate to negate the reliance element even of fraudulent-inducement claims arising from the same contract containing the merger clause. *Schlumberger*, 959 S.W.2d at 181 ("We emphasize that a disclaimer of reliance *or merger clause* will not *always* bar a fraudulent inducement claim.") (emphasis added). Moreover, several of our sister courts and the Fifth Circuit have equated merger clauses similar to section 15.05 with the type of disclaimers of reliance applied in *Schlumberger* and *Prudential*. *See*, *e.g.*, *IKON*, 125 S.W.3d at 126-28 (provisions that contract was "entire agreement" and requiring any modifications to be in writing barred fraudulent-inducement claim under *Schlumberger*); *Yzaguirre v. KCS Res., Inc.*, 47 S.W.3d 532, 542-43 (Tex. App.—Dallas 2000), *aff'd*, 53 S.W.3d 368 (Tex. 2001) (merger clause in settlement agreement containing "entire agreement" provision and statement that "[n]o oral understandings, statements, promises or inducements contrary to this Settlement Agreement exist" characterized as "disclaimer" and applying *Schlumberger* to preclude fraudulent-inducement claim); *see also U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399, 403-04 (5th Cir. 2000) (applying Texas law and concluding that merger clause showed parties "intended to abandon any alleged agreement to enter a second written contract"); *Armstrong v. American Home Shield Corp.*, 333 F.3d 566, 571 (5th Cir. 2003) (applying *Schlumberger* to negate fraud claims based on merger clause).

By contractually "cancelling" all pre-FLA "agreements, negotiations, commitments and understandings" and "supersed[ing]" them with the FLA, a merger clause like section 15.05 amounted to a disclaimer of the existence of pre-contract agreements, promises or representations and any right of the parties to rely upon them. We conclude that section 15.05 is susceptible to being

38

enforced as a disclaimer of representations or reliance under the *Schlumberger* or *Prudential* analyses.

We next consider the extent to which section 15.05 and the FLA, as a matter of contract law, encompass the alleged agreements or understandings that were the basis of Blind Maker's fraudulent inducement theory of fraud.[22]  Blind Maker points out that section 15.05 states that the FLA is the "entire agreement" only "*with respect to the subject matter hereof.*"  It urges that the FLA's "subject matter" is "exceedingly narrow," addressing only licensing issues and not the credit or benefits issues at the root of its fraud claims.  In response, Springs asserts that the FLA's subject matter extends to all aspects of the parties' manufacturer-fabricator relationship.  While we disagree with Blind Maker's characterization of the FLA as merely a licensing agreement, we agree that section 15.05 and the FLA do not absorb all of the representation or understandings made the basis of Blind Maker's fraudulent-inducement theory of fraud.

A merger clause like section 15.05 memorializes the parties' intent to integrate or absorb their prior negotiations, agreements, or understandings concerning the same subject matter into a subsequent written contract.  *See, e.g.*, *Fish*, 948 S.W.2d at 898-99; *Leon Ltd. v. Albuquerque Commons P'ship.*, 862 S.W.2d 693, 700 (Tex. App.—El Paso 1993, no writ).  Where the parties

---

[22]  *See Schlumberger*, 959 S.W.2d 171, 179-80 (Tex. 1997) (looking to "well-established rules of contract interpretation" as first step in determining whether release was enforceable to bar fraudulent inducement claims); *Prudential*, 896 S.W.2d at 161-62 ("terms of the agreement" among factors to be considered in determining whether "as is" clause is enforceable).

Section 15.06 of the FLA provides that the agreement is to be construed for all purposes in accordance with Wisconsin law.  Because neither party asserts that Wisconsin law differs from Texas law in any respect that bears upon our analysis here, we will employ Texas law.

have concluded a valid integrated agreement dealing with the subject matter between them, the parol evidence rule will prevent enforcement of prior or contemporaneous agreements that are inconsistent with the integrated agreement. *Fish*, 948 S.W.2d at 898; *Leon*, 862 S.W.2d at 700; *see also Lawson*, 127 S.W.3d at 872. However, this bar does not preclude enforcement of prior or contemporaneous agreements which are collateral to, are not inconsistent with, and do not vary or contradict the express or implied terms or obligations of the integrated agreement. *Hubacek*, 317 S.W.2d at 32. To be collateral, the prior agreement must be such that as the parties might naturally make separately and would not ordinarily be expected to embody in the integrated agreement; further, the allegedly collateral agreement must not be so clearly connected with the principal transaction as to be part and parcel thereof. *Fish*, 948 S.W.2d at 899; *Leon*, 862 S.W.2d at 700-01.

The FLA not only addresses but also squarely contradicts Blind Maker's claim that Springs fraudulently failed to disclose that it might "take away" the 2% early payment discount by strictly enforcing it. The FLA explicitly provided, among Blind Maker's Gold preferred fabricator requirements, "2% 15, net 60"—that Blind Maker could take the discount only if it paid within fifteen days of invoice.[23]

We accordingly conclude that section 15.05 operates to negate the existence of Blind Maker's prior understanding regarding the 2% discount. *See Fish*, 948 S.W.2d at 899; *Leon*, 862 S.W.2d at 700-01.[24] Other pre-FLA representations or understandings, while not flatly contradicting

---

[23] This term was repeated in both the 1999 Marketing Plan brochure and the Orlando slide show.

[24] Some of our sister courts have held that, even without merger clauses or contractual disclaimers of reliance, fraud claims predicated upon alleged representations squarely contradicted by the express, unambiguous terms of a written agreement are foreclosed as a matter of law because

40

the agreement, fall within the subject matter of the agreement and are thereby absorbed into it.  *See*

*Leon*, 862 S.W.2d at 700-01.   The FLA addresses fabricator classifications in the following

provision:

> Springs Fabricators are classified as Preferred (Gold, Silver, or Bronze) or Standard
> Distributor/Fabricator.  Fabricator agrees to strictly comply with all requirements for
> its assigned category, which are attached . . . .   The requirements are subject to
> quarterly review and revision.

Any representation or understanding concerning whether Blind Maker could have become a standard

fabricator would fall within the subject matter of this provision.

On the other hand, in light of our earlier review of the negotiations preceding the

FLA, we cannot conclude as a matter of law that the FLA was intended to address the preferred

fabricator benefits that Blind Maker was to receive, the relationship between any promises regarding

these benefits and the FLA, or whether the 3% margin improvement fund benefit could change.  *See*

*Hubacek*, 317 S.W.2d at 31-32.  Although these benefits were discussed before Blind Maker's entry

---

reliance is not justifiable.  *See In re GTE Mobilnet of S. Tex. Ltd. P'ship*, 123 S.W.3d 795, 799-800
(Tex. App.—Beaumont 2003, orig. proceeding); *DRC Parts & Accessories, L.L.C. v. VM Motori,
S.P.A.*, 112 S.W.3d 854, 858-59 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *cf. TCA Bldg.
Co. v. Entech, Inc.*, 86 S.W.3d 667, 674-75 (Tex. App.—Austin 2002, no pet.) (reliance element of
fraud claim negated as matter of law where plaintiff rejected contract containing alleged
misrepresentation).  These courts have reasoned that, because a contrary approach "would defeat the
ability of written contracts to provide certainty and avoid dispute, the prevailing rule . . . is instead
that a party who enters into a written contract while relying on a contrary oral agreement does so at
its peril and is not rewarded with a claim for fraudulent inducement when the other party seeks to
invoke its rights under the contract."  *DRC*, 112 S.W.3d at 859.  "Otherwise, contracts would be
'nothing more than a scrap of paper.'"  *Fisher Controls Intern., Inc. v. Gibbons*, 911 S.W.2d 135,
141-42 (Tex. App.—Houston [1st Dist.] 1995, pet. denied) (quoting *Howeth v. Davenport*, 311
S.W.2d 480, 482 (Tex. Civ. App.—San Antonio 1958, writ ref'd n.r.e.)).

into the FLA, the agreement is entirely silent regarding them.[25] Springs's own correspondence, moreover, suggests that it viewed the preferred fabricator benefits as distinct from the FLA. In his letter acknowledging Hicks's first execution of the FLA in January 1999, Dudas wrote that "the Preferred benefits will begin on February 1, 1999 [and] will be distributed *as per our 1999 Fabricator publication and our discussions in Orlando*." (Emphasis added). Because we hold that the FLA was not intended to encompass every aspect of the parties' manufacturer-fabricator relationship, evidence that Springs misled Blind Maker regarding their "partnership" while concealing Project Overlord is also not excluded by the merger clause.

We now consider whether section 15.05 is enforceable to negate the reliance element of Blind Maker's fraudulent-inducement theory to the extent that theory is predicated on representations or understandings we have held to be within the FLA's "subject matter." As our first step, we must consider whether *Schlumberger* or *Prudential* controls our analysis. *Schlumberger* addressed the enforceability of a release to bar a claim that the plaintiff had been fraudulently induced into the same settlement agreement in which the release was contained. *Schlumberger*, 959 S.W.2d at 177-81. *Prudential*, by contrast, addressed the enforceability of an "as is" clause and

---

[25] The FLA does contain a general provision obligating Springs to sell to the fabricator "sufficient quantities of samples and displays . . . catalogs, and other advertising and promotional aids to sufficiently service" the fabricator's territory, as well as a requirement that Springs make available technical information concerning the licensed products, including finished product specifications, fabrication and assembly instruction, installation and repair instructions, and similar information. These provisions do not appear to address the same advertising and consulting benefits Springs depicted as preferred fabricator benefits. Similarly, while the FLA reserves Springs's "right to change prices and standard terms and conditions of sale," our review of the evidence indicates that these terms and prices were distinct from the discounts and incentives offered under the preferred fabricator benefit program.

42

disclaimer of reliance to bar tort claims where the plaintiff did not allege or prove that he had been fraudulently induced into the contract. *Prudential*, 896 S.W.2d at 161-62 ("A buyer is not bound by an agreement to purchase something 'as is' that he is induced to make because of a fraudulent representation or concealment of information by the seller."). Blind Maker suggests that *Schlumberger* would control our analysis but is unavailable because section 15.05 is not a release incident to a settlement terminating the parties' relationship. *See Schlumberger*, 959 S.W.2d at 179-80 (sole purpose of release was to end dispute); *see also John v. Marshall Health Servs., Inc.*, 91 S.W.3d 446, 449-50 (Tex. App.—Texarkana 2002, pet. denied); *Woodlands Land Dev. Co. v. Jenkins*, 48 S.W.3d 415, 422 (Tex. App.—Beaumont 2001, no pet.); *Fletcher v. Edwards*, 26 S.W.3d 66, 77 (Tex. App.—Waco 2000, pet. denied).[26] Springs contends that *Prudential* governs because the jury failed to find that it had fraudulently induced Blind Maker into the FLA. While we emphasize that the jury's failure to find fraudulent inducement in Question 6 is not an affirmative finding of no fraudulent inducement, we agree with Springs that the jury's rejection of Blind Maker's fraudulent inducement defense to the FLA in Question 6 brings this case closer to *Prudential* than

---

[26] *But see IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113,126-28 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (applying *Schlumberger* to bar fraudulent inducement claim relating to employment contract because agreement was intended to put end to pre-contract dispute over plaintiff's job responsibilities following acquisition of his company by defendant); *Armstrong v. American Home Shield Corp.*, 333 F.3d 566, 571 (5th Cir. 2003) (not considering whether agreement was settlement agreement or release); *see also U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399, 403-04 (5th Cir. 2000). Also, in an unreported opinion, we applied *Schlumberger* to enforce a merger clause to bar fraudulent-inducement claims relating to an earnest money contract without considering that the contract was not a settlement agreement. *Starlight v. Xarin Austin I, Ltd.*, 1999 Tex. App. LEXIS 159, at *22-25 (Tex. App.—Austin Jan. 14, 1999, no pet.) (not designated for publication).

*Schlumberger*.[27] We thus apply *Prudential* to determine whether, under the unique circumstances of this case, section 15.05 negates the reliance element of Blind Maker's fraudulent inducement theory as a matter of law to the extent that theory is predicated upon representations and nondisclosures we have held to be within the FLA's scope. *See Prudential*, 896 S.W.2d at 161.

In *Prudential*, the supreme court held that an "as is" clause and disclaimer of reliance negated the causation element of various tort claims as a matter of law. *Id*. "By agreeing to purchase something 'as is,'" the court explained, "a buyer agrees to make his own appraisal of the bargain and to accept the risk that he may be wrong. . . . The seller gives no assurances, express or implied, concerning the value or condition of the thing sold." *Id*. As for the disclaimer of reliance, the supreme court stated simply that it "was an important element of their arm's length transaction and is binding . . . unless set aside." *Id*. But the court qualified its holding by emphasizing that this type of agreement would not have "this determinative effect in every circumstance" because "other aspects of a transaction may make an 'as is' agreement unenforceable":

---

[27] Even if the jury's fraud finding in Question 1 was based on evidence of fraudulent inducement—a possibility left open by Springs' failure to preserve a conflict objection—it would have no bearing on the effect we give the jury's failure to find fraudulent inducement in Question 6. Question 1 does not submit Blind Maker's fraudulent inducement defense; only Question 6 does. A finding of fraud in Question 1 is not a finding establishing Blind Maker's fraudulent inducement defense at least where, as here, Blind Maker purports to rely in Question 1 on evidence of fraud other than fraudulent inducement. *Compare Anderson, Greenwood & Co. v. Martin*, 44 S.W.3d 200, 211-12 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (jury finding of liability on affirmative fraudulent inducement claim established fraudulent inducement defense even though plaintiff only pled and did not specifically submit that defense). Fraudulent inducement is only "*a particular species* of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof." *Haase v. Glazner*, 62 S.W.3d 795, 799 (Tex. 2001) (Emphasis added.). Only Question 6 submits Blind Maker's fraudulent-inducement defense issue to the jury, and the jury's adverse finding alone controls that issue.

The nature of the transaction and the totality of the circumstances must be considered. Where the "as is" clause is an important part of the basis of the bargain, not an incidental or 'boiler-plate' provision, and is entered into by parties of relatively equal bargaining position, a buyer's affirmation and agreement that he is not relying on representations by the seller should be given effect."

*Id*.

Recently, we applied *Prudential* to hold that an "as is" clause and disclaimer of warranties in a commercial lease barred negligence, fraud, and breach-of-warranty claims arising from a fire in the leased premises. *Gym-N-I Playgrounds, Inc. v. Snider*, 158 S.W.3d 78, 84-85 (Tex. App.—Austin 2005, pet. filed). We considered five "*Prudential* factors": (1) the sophistication of the parties; (2) the terms of the "as is" agreement; (3) whether the "as is" agreement was freely negotiated; (4) whether the agreement was an arm's length transaction; and (5) whether there was a knowing misrepresentation or concealment of a known fact. *Id*. at 85 (citing *Procter III v. RMC Capital Corp.*, 47 S.W.3d 828, 833 (Tex. App.—Beaumont 2001, no pet.)). We also noted that whether a party was represented by counsel is also important in our assessment of both the party's relative sophistication and whether the agreement was freely negotiated. *Id*. Our overall inquiry was to determine, based on the factors, whether the "as is" clause met the "letter and spirit of *Prudential*" and should be held valid. *Id*. We held that the "as is" agreement should be enforced, noting in particular the sophistication of the parties, the terms of the "as is" clause, and admissions of lack of fraudulent inducement. *Id*. at 85-86. We also emphasized that, before signing the lease, the owners of Gym-N-I also had actual knowledge of the very building conditions later made the basis of the suit, yet signed the "as is" clause with awareness of that provision and its meaning. *Id*.; *cf.*

*Schlumberger*, 959 S.W.2d at 180 (release executed in context of dispute concerning very issues later made basis of suit).

We apply these factors here. First, we note that in *Prudential*, the supreme court held that Goldman's "contractual disavowal of reliance was an important part of their arm's-length transaction and is binding on Goldman unless set aside." *Prudential*, 896 S.W.2d at 161. Although Blind Maker asserted fraudulent-inducement and anticipatory-breach defenses to bar enforcement of the FLA and effectively set it aside, the jury rejected these defenses.

Moreover, there is no dispute that the parties dealt at arms' length and that Blind Maker's principal, Hicks, was a sophisticated businessman. Hicks had earned an M.B.A., as well as a masters in engineering. He had been in the blinds business since 1981, overseeing a company with annual sales in the tens of millions of dollars. Hicks, furthermore, had assistance of counsel to review the FLA and was able to negotiate changes to other provisions. Blind Maker signed not one but two iterations of the FLA,[28] each of which reflected negotiated terms.

We also find it significant that, by May, Hicks had already begun to question Springs's "integrity" with regard to the preferred fabricator program, as manifested in his April 19,

---

[28] Springs asserts that Blind Maker executed the FLA a third time, in October 1999, and characterizes this act as ratifying any earlier fraudulent acts, including Springs's "change" regarding the 2% early payment discount. *See Meyer v. Cathey*, 167 S.W.3d 327, 331-32 (Tex. 2005); *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.2d 671, 676-80 (Tex. 2000). Springs's sole evidence to support this assertion pertains to a one-page addendum to the FLA that Hicks executed on October 5, 1999, amending the exhibit listing the products Blind Maker was permitted to sell. We reject Springs's characterization of this one-page amendment as a third execution of the entire agreement or as a ratification of any prior fraud.

1999, letter to Dudas. Despite these concerns, Blind Maker executed the FLA, including section 15.05, a second time in May 2000.

In sum, Blind Maker was a sophisticated party who, with advise of counsel, twice signed a contract disclaiming the existence of extra-contractual "agreements," "commitments," or "understandings" within the subject matter of the FLA in the face of brewing disputes regarding some of these "understandings." Blind Maker now attempts to claim fraud based on alleged misrepresentations and nondisclosures the subject of which are addressed or even squarely contradicted by the contract's clear terms. Under these circumstances, it is within the "letter and spirit" of *Prudential* to hold that section 15.05 negates, as a matter of law, the reliance element of Blind Maker's fraudulent inducement theory to the extent it is predicated upon evidence of representations or understandings within the scope of the FLA. Specifically, Blind Maker's fraudulent inducement theory is foreclosed to the extent it is based on the following evidence:

- Evidence that Springs misrepresented that Blind Maker had to sign the FLA as a preferred fabricator or, as of June 1, 1999, it would not be permitted to purchase Springs products.

- Evidence that Springs failed to disclose that Blind Maker could continue doing business with Springs as a standard fabricator.

- Evidence that Springs failed to disclose that it would "take away" Blind Maker's ability to take 2 percent discounts on payment terms beyond 15 days.

We emphasize that our holding should not be construed as a categorical "roadmap to future tortfeasors giving them the means to avoid liability merely by including a boilerplate merger clause in a contract," as Blind Maker cautions us against. *Reaves* remains the law of Texas. *See* 307

47

S.W.2d at 234-39.  However, in these circumstances, *Prudential* compels us to give effect to the merger clause in the FLA.  *Compare Prudential*, 896 S.W.2d at 161-62, *with Plunkett*, 27 S.W.2d at 616 (where jury found fraudulent inducement, merger clause did not bar tort claims).  Moreover, we emphasize again our holding that section 15.05 does not bar Blind Maker's fraudulent inducement theory to the extent it is predicated upon representations or understandings we have determined to be beyond the FLA's scope.

*Duty to disclose*

Finally, Springs argues that Blind Maker's fraudulent-inducement theory fails as a matter of law to the extent it is predicated upon Springs's failure to disclose material facts, as opposed to affirmative misrepresentations.  Springs first contends that no evidence supports the submission of a fraud-by-nondisclosure theory.  Springs argues in the alternative that Blind Maker waived the right to recover on any fraud-by-nondisclosure theory by failing to obtain a predicate finding that Springs had a duty to disclose the facts in question to Blind Maker.

A failure to disclose information does not constitute fraud unless there is first a duty to disclose the information.  *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001); *Insurance Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998).  Such a duty can arise where there is a fiduciary or confidential relationship between the parties.  *Morris*, 981 S.W.2d at 674.  However, silence may also be equivalent to a false representation in certain circumstances, but "only when the particular circumstances impose a duty on the party to speak and he deliberately remains silent."  *Bradford*, 48 S.W.3d at 755; *SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 353 (Tex. 1995); *Smith v.*

48

*National Resort Communities, Inc.*, 585 S.W.2d 655, 658 (Tex.1979). Whether a duty to disclose

exists is a question of law. *Bradford*, 48 S.W.3d at 755.

Because the existence of a duty to disclose is a question of law, we reject Springs's

alternative argument that Blind Maker was required to obtain a predicate finding that Springs owed

it a duty to disclose.[29] We thus consider whether there is legally and factually sufficient evidence

of "particular circumstances" that would give rise to a duty to disclose on the part of Springs. *See*

*Bradford*, 48 S.W.3d at 755.

The jury charge required Blind Maker to show that (1) Springs failed to disclose a

material fact within its knowledge; (2) Springs knew that Blind Maker was ignorant of that fact and

did not have an equal opportunity to discover the truth; and (3) Springs's failure to disclose the fact

was intended to induce Blind Maker to take some action. Blind Maker contends that Springs had

a duty to disclose the following facts before it entered into the FLA: (1) that Springs viewed its

representations concerning the preferred fabricator benefits it would make available to Blind Maker

as mere "intentions," not binding commitments; (2) that Springs would eventually change the 3%

---

[29] Springs relies on *Choi v. McKenzie*, 975 S.W.2d 740, 743 (Tex. App.—Corpus Christi 1998, pet. denied), for the proposition that Blind Maker was required to obtain a predicate finding of duty to disclose. However, *Choi* involved the question of whether the "confidential relationship" exception to the statute of frauds applied, not whether a duty to disclose exists in a fraud cause. *Id*. at 743. Moreover, the parties had agreed that the duty-to-disclose issue was one of fact. *Id*.

Based on its argument that Blind Maker was required to obtain a predicate finding regarding duty to disclose, Springs contends that we must reverse and remand for new trial under *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000), because Blind Maker's "invalid" fraud-by-nondisclosure theories were commingled in a single broad-form question with Blind Maker's fraudulent misrepresentation theories. We need not address this question because we conclude above that legally and factually sufficient evidence supports the submission of Blind Maker's fraud-by-nondisclosure theory.

margin improvement fund benefit, which was based on purchase volume, to a strictly growth-based incentive; (3) the existence of Project Overlord and that Blind Maker was a target of it; (4) that Springs would "take away" the 2% early payment discount by strictly enforcing it; (5) that Blind Maker could continue doing business as a standard fabricator and was not required to sign the FLA as a preferred fabricator. Blind Maker's reliance on the latter two facts as a basis for its fraudulent-inducement theory is foreclosed by section 15.05 of the FLA, as previously explained. *Cf. Schlumberger*, 959 S.W.2d at 181-82 (release negated reliance element of both misrepresentation and nondisclosure-based fraud claims). We also believe that there is no evidence that Springs had a duty to disclose that it would someday change the 3% margin improvement fund benefit into a growth-based incentive.

In *Bradford v. Vento*, the supreme court emphasized that the second element required by the charge—that Springs knew that Blind Maker was ignorant of the fact and did not have an equal opportunity to discover the truth—incorporates two requirements: (1) the defendant must be shown to have known that the plaintiff was ignorant of a material fact, *and* (2) the fact must be one that the plaintiff did not have an equal opportunity to discover. *See* 48 S.W.3d 749.

*Bradford* involved a fraud claim asserted by Vento, who became embroiled in a dispute over whether he had purchased a sports memorabilia shop from Taylor. *Id*. at 752-54. The shop was located at a mall. *Id*. at 752. After believing he had purchased the shop from Taylor, Vento went to Bradford's office, paid the shop's rent for the month of October 1994, informed Bradford that he had purchased the store, and inquired about a long-term lease. *Id*. Bradford congratulated Vento on purchasing the store, indicated that he had heard about his purchase,

50

informed him that the monthly rent he had paid was a "decent deal," suggested that a long-term was a bad idea, and said he would "take care of" Vento in January. *Id*. Bradford did not mention that the store's lease was non-assignable, that additional rent would be due for December, and that Vento would be required to apply for a new lease. *Id*. Sometime after this meeting concluded, Taylor informed Bradford that he still owned the store and that there could be trouble with Vento. *Id*. at 752-53. Bradford alerted mall security, an altercation ensued involving Vento, Taylor, Bradford, and mall security, and Vento was asked by police to leave the mall because he could not prove his ownership. *Id*. at 753. Vento sued Bradford, among others. *Id*.

The trial court submitted theories of both fraudulent misrepresentation and fraudulent nondisclosure to the jury, which awarded damages to Vento against Bradford. *Id*. at 753-54. The supreme court reversed, holding that there was no evidence that Bradford knew Vento was ignorant of a fact and did not have an equal opportunity to discover the truth. It relied on the fact that even though Vento claimed to have purchased the store, he never asked Bradford or any other mall personnel for a copy of the store's lease, the terms of the lease, or whether any rent was due for the two months between his meeting and January. *Id*. at 756. It added that Vento had never asked for the lease to be assigned to him and that he had only inquired about a long-term lease for himself. *Id*. Moreover, the supreme court held, there was "no evidence that Bradford knew that Vento had not obtained or could not obtain the information from other sources, such as Taylor, from whom Vento was buying the store." *Id*. at 755-56.

In this case, there is no evidence that Springs knew either that Hicks or Blind Maker had understood that the 3% margin improvement discount (or any other preferred benefit) was a

51

permanent entitlement that could not be changed.[30]  If anything, the evidence demonstrates that Springs either disclosed this possibility to Blind Maker before Blind Maker entered into the FLA or that Blind Maker would have had an equal opportunity to discern it from Springs's disclosures. Blind Maker purports to rely on a set of representations encompassed within Springs "*1999 Marketing Plan*," a designation that implies limited duration.  Moreover, during the discussions concerning the pilot program, the model for the preferred fabricator benefits program, Blind Maker was cautioned that "*Note*: Marketing plans may be modified periodically to reflect business condition[s]."  Hicks or Blind Maker did even less than Vento to inquire whether the preferred fabricator benefits represented in the 1999 Marketing Plan and Pilot Program were permanent. Under *Bradford*, Blind Maker cannot rely purely on such unexpressed, subjective understandings as a basis for fraud.[31]

However, we conclude that there is legally and factually sufficient evidence giving rise to a duty on the part of Springs to disclose that it regarded its representations concerning the

---

[30]  Nor is there evidence of any affirmative representations by Springs to the effect that the preferred benefits could not be changed.  Blind Maker appears to suggest that the document presented to Hicks during the Orlando conference illustrating Blind Maker's potential 1999 earnings if it became a preferred fabricator impliedly represented that the benefits would not be changed. Even if this were an otherwise valid inference, the document refers only to Blind Maker's prospective earnings in *1999* and is not evidence of representations concerning benefits or earnings in any future year.

[31]  For similar reasons, we also hold that Springs had no duty to disclose that it would enforce the fifteen-day condition for obtaining the 2% early payment discount.  Springs repeatedly disclosed to Blind Maker that its payment terms for preferred fabricators were "2% 15, net 60" not only in the express terms of the FLA, but also in the 1999 Marketing Plan brochure, the Orlando slide show, and even in the discussions concerning the pilot program.  The absence of such a duty is an independent bar to Blind Maker's assertions that Springs's enforcement of the early payment discount terms constituted fraud-by-nondisclosure.

preferred fabricator benefits at the Orlando conference and in the 1999 Marketing Plan to be non-binding "intentions." As previously discussed, there is evidence that Springs affirmatively represented that it would provide certain special benefits to fabricators who executed the FLA and opted for preferred fabricator status, and it made further representations that additional benefits would be provided to "Gold" preferred fabricators. Blind Maker relied on these representations in executing the FLA as a Gold preferred fabricator—Hicks testified that he would not have signed the agreement except to obtain the promised benefits but that Springs ultimately failed to deliver the benefits. Dudas appeared to confirm that fact. Springs's actions raise the inference that it knew Blind Maker was ignorant that Springs's promised benefits were merely intentions, yet remained silent with the intent to induce Blind Maker to sign the FLA in reliance on a belief that Springs's representations were firm commitments. Similarly, the combination of the representations regarding Springs's desire to be partners with its fabricators with the proof regarding the nature of Project Overlord constitutes evidence Springs knew Blind Maker was ignorant of the plan. Under these circumstances, we find there is legally and factually sufficient evidence that Springs owed a duty to disclose Project Overlord and that it regarded its representations concerning preferred fabricator benefits to be mere expressions of intention, that Blind Maker's fraud-by-nondisclosure theory was properly submitted to the jury, and that this evidence is sufficient to support the jury's finding of fraud under Blind Maker's fraudulent inducement theory. *See*, *e.g.*, *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986) (silence can be equivalent to false misrepresentation where particular circumstances impose duty to speak).

*Conclusion regarding Blind Maker's fraudulent-inducement theory*

We hold that there is legally and factually sufficient evidence of fraudulent inducement in that: (1) Springs misrepresented that Blind Maker would receive certain preferred fabricator benefits and Gold preferred fabricator benefits if it signed the FLA as that classification of fabricator; (2) Springs failed to disclose its view that these representations were mere "intentions" and not firm commitments, and (3) Springs failed to disclose that Blind Maker was a target of Project Overlord. However, in light of section 15.05 of the FLA and Texas legal standards regarding fraud-by-nondisclosure, Blind Maker's other evidence supporting its fraudulent-inducement theory cannot have probative value and, thus, is no evidence of fraudulent inducement.

### The white sale theory

We turn to Springs's second legal and factual sufficiency argument—that the evidence is insufficient to support Blind Maker's white sale theory. Blind Maker's "white sale" theory is also predicated upon a duty on the part of Springs to disclose a fact. As Blind Maker described it in its initial brief, "Springs not only did not prevent TBM from making its customary large year-end purchases or even caution or warn TBM not to make it, Springs actually encouraged TBM to make these purchases" while it was in danger of exceeding the internal limits that Springs had imposed on Blind Maker's credit. We hold there is no evidence giving rise to a duty to disclose on the part of Springs under these circumstances.

As previously noted, there is no general duty to disclose information. *Bradford*, 48 S.W.3d at 755. Blind Maker does not allege that it has the sort of fiduciary or confidential relationship that could give rise to such a duty. *See Morris*, 981 S.W.2d at 674. Nor is there

54

evidence that Springs knowingly failed to disclose a fact that Blind Maker did not have the equal opportunity to discover. *Bradford*, 48 S.W.3d at 755-56. Even assuming that Springs had an internal credit benchmark for Blind Maker of which Blind Maker was unaware, Blind Maker knew of, and had ready access to, the two contracts that set forth the parties' respective rights regarding Blind Maker's credit purchases—the 1997 credit agreement and the FLA. Under the credit agreement, Blind Maker acknowledged that Springs "is not obligated to sell goods to [Blind Maker] or to grant open account payment terms," and that "[t]he decision to sell product and extend credit shall be solely within the exclusive discretion of Springs." The agreement further provided that Blind Maker "hereby agrees to make payments as necessary to keep the account balance within terms established by Springs," and that if Blind Maker failed to do so, Springs "may immediately suspend all future shipments on other than prompt payment terms such as cash or cashier's check and may further demand immediate payment of the full balance." In the FLA, Blind Maker agreed that all of its orders "shall be subject to the approval of Springs's credit department," and gave Springs broad power to obtain information regarding Blind Maker's financial condition. In the face of these explicit contractual limitations,[32] Blind Maker took the risk of assuming significant additional debt in what Hicks testified was an attempt to meet the 5% threshold necessary to attain the 2% performance growth fund benefit.[33] At most, Blind Maker's evidence indicates only that Springs exercised its rights under contracts governing these sophisticated parties' credit transactions. Texas

---

[32] There was also evidence that Springs had previously expressed concern regarding Blind Maker's debt and late payments of accounts payable, as suggested by Springs's $500,000 loan to Blind Maker in early 1998 to help it pay down lagging accounts payable.

[33] We also observe that Blind Maker also voluntarily had assumed the obligations under the 1997 credit agreement, and does not assert it was fraudulently induced into that agreement.

55

companies do not owe other Texas companies a general duty to provide each other business advice in their arms' length credit transactions. Failure to do so is not actionable fraud by failure to disclose under Texas law. There is thus no evidence to support Blind Maker's white sale theory of fraud.

### The "customer list" theory

Next, we consider Springs's third sufficiency challenge—that the evidence is legally and factually insufficient to support Blind Maker's "customer list" fraud theory. Blind Maker had alleged that Springs fraudulently obtained confidential information regarding its customers through the "Clear to the TOP" promotion and used it a few months later to compete for those customers. On appeal, Springs contends there is insufficient evidence to support the element of intent. The jury was instructed that it could find fraud by misrepresentation based on "[a] promise of future performance made with an intent, at the time the promise was made, not to perform as promised."

A promise to do an act (or refrain from an act) in the future constitutes fraud only when made with no intention of performing the promise at the time the promise was made. *Formosa*, 960 S.W.2d at 48; *Spoljaric*, 708 S.W.2d at 434; *Power Res. Group, Inc. v. Public Util. Comm'n*, 73 S.W.3d 354, 362 (Tex. App.—Austin 2002, pet. denied). Thus, the mere failure to subsequently perform a promise, standing alone, is not evidence of fraud. *Formosa*, 960 S.W.2d at 48; *Power Res. Group*, 73 S.W.3d at 362. Rather, Blind Maker must have presented evidence that Springs made representations with intent to deceive and with no intention of performing as represented. *See Formosa*, 960 S.W.2d at 48. The evidence presented must have been relevant to Springs's intent at the time the representation was made. *See id*.

Such fraudulent intent may be established by either direct or circumstantial evidence, and the subsequent failure to perform the promise, while not alone dispositive, can be considered with other factors to establish intent. *Spoljaric*, 708 S.W.2d at 434-45. The supreme court has stated that "'[s]light circumstantial evidence' of fraud, when considered with a breach of promise to perform, is sufficient to support a finding of fraudulent intent." *Id*. at 435 (quoting *Maulding v. Niemeyer*, 241 S.W.2d 733, 738 (Tex. Civ. App.—El Paso 1951, orig. proceeding)). Intent tends to be a fact question uniquely within the realm of the trier of fact because it so depends on the credibility of witnesses and the weight given to their testimony. *Id*. at 434. Although circumstantial evidence may be used to establish any material fact, it must transcend mere suspicion; there must be a logical bridge between the proffered evidence and the fact. *IKON*, 125 S.W.3d at 124 (quoting *Lozano v. Lozano*, 52 S.W.3d 141, 149, 151 (Tex. 2001) (Phillips, C.J., concurring and dissenting)); *see also City of Keller*, 168 S.W.3d at 810-11.

A desire to compete against or acquire another business is not alone evidence of fraudulent intent. However, we must consider, in combination, evidence of: (1) Project Overlord, (2) Springs's acts in connection with the FLA and the preferred fabricator benefits, and (3) Springs's ultimate violation of its promises that the customer information would be kept confidential. We conclude that, together, this evidence supports an inference that Springs had implemented a scheme to induce Blind Maker into the FLA with false promises and to progressively weaken it economically by fraudulent acts or withholding or eliminating promised benefits, with a goal of ultimately acquiring it or otherwise taking its customers. Even if we have determined that some of the component acts are not in themselves actionable fraud, we nonetheless conclude that they may be

57

probative of Springs's intent at the time it induced Springs to divulge its customer information.[34]
In so concluding, we are especially mindful that intent tends to be a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given their testimony, *Spoljaric*, 708 S.W.2d at 435-36, and that the supreme court has cautioned us that even "slight" circumstantial evidence of fraud, when considered with the breach of a promise to perform, is sufficient to support a finding of fraudulent intent. *Id*. at 435. We hold that there is legally and factually sufficient evidence supporting the intent element of Blind Maker's "customer list" fraud theory and, thus, the jury's finding of fraud in Question 1.[35]

### Termination theory

Finally, we consider Springs's fourth sufficiency argument—that there is legally insufficient evidence of Blind Maker's termination theory. Blind Maker alleged that, at the time it entered into the FLA, made purchases under it, or decided to terminate the FLA, Springs was intentionally remaining silent to mislead Blind Maker regarding its intentions to (1) cease treating

---

[34] However, we express no opinion regarding whether the existence of Project Texas, Zabel's memorandum, or the mere act of competing for Blind Maker's customers after it learned that Blind Maker would terminate and cause Springs to lose its main conduit to the Texas market are, standing alone, evidence that Springs had fraudulent intent at the time it induced Blind Maker to divulge its customer information. *Compare IKON*, 125 S.W.3d at 131-32 (acts by acquiring company after president of acquired company had proposed consolidating their operations into single marketplace were no evidence that, when signing acquisition agreement, acquiring company had no intent to honor its promise to maintain plaintiff's company as stand-alone company for two years), *with Formosa*, 960 S.W.2d at 47-48 (proof that defendant had breached promises subsumed in contract even before plaintiff signed contract was legally sufficient evidence that defendant had no intent of performing).

[35] The parties dispute whether Blind Maker was required to show intent or merely recklessness with regard to whether Springs would perform its promise in the future. Because we find sufficient evidence of intent, we need not address this issue.

Blind Maker with the rights of a preferred fabricator during the remaining term of the FLA; (2) refuse to sell Springs products to Blind Maker after the term expired; (3) consider Blind Maker's termination notice a factor in placing a credit hold, thereby withholding product; and (4) make false representations to Blind Maker's customers concerning the reasons why Blind Maker was no longer selling Springs's products. The evidence was undisputed that Blind Maker was the first preferred fabricator ever to terminate the FLA. It is pure speculation to posit that, at the time Blind Maker executed the FLA, Springs would have known that Blind Maker would terminate the FLA sixteen months later, much less have formulated plans to harm Blind Maker thereafter or have intentionally remained silent regarding those plans in order to induce Blind Maker into entering the FLA. *See Bradford*, 48 S.W.3d at 755. Nor is there evidence to support any inferences of such knowledge and intent at the time Blind Maker made purchases under the FLA or decided to give notice of termination.[36]

As Springs suggests, Blind Maker's termination theory appears to be a repackaging of allegations it asserted at trial to support its now-dismissed causes of action for breach of contract, business defamation, or tortious interference. They are not proof of fraud. Moreover, any fraud-by-

---

[36] Blind Maker also asserts a "termination claim" with respect to Springs's misuse of its customer information. It is pure speculation that, at the time Blind Maker signed the FLA, Springs had already planned to obtain and misuse Blind Maker's customer information and intentionally remained silent to induce Blind Maker into the FLA. However, because we have concluded that there is legally and factually sufficient evidence that Springs fraudulently obtained Blind Maker's customer information in March 2000, there likewise may be sufficient evidence that Springs remained silent concerning its plans to use the information in order to induce Blind Maker's subsequent purchases, and may have had a duty to disclose the information before Blind Maker gave notice to terminate the FLA. We need not address these issue because any damages arising from such claims would be subsumed within the damages recoverable under Blind Maker's customer list claim.

59

nondisclosure theory based on at least two of the allegations would be independently barred because Springs's right to take the actions that Blind Maker complains of are explicitly set forth in the 1997 credit agreement and the FLA, to which both parties had equal access. *See Bradford*, 48 S.W.3d at 755. Blind Maker claims that Springs committed fraud in connection with its placing of credit holds, yet Blind Maker acknowledged in the 1997 credit agreement that Springs "is not obligated to sell goods to [Blind Maker] or to grant open account payment terms," and that "[t]he decision to sell product and extend credit shall be solely within the exclusive discretion of Springs." Blind Maker further agreed to "to make payments as necessary to keep the account balance within terms established by Springs," and that if Blind Maker failed to do so, Springs "may immediately suspend all future shipments on other than prompt payment terms such as cash or cashier's check and may further demand immediate payment of the full balance." In the FLA, moreover, Blind Maker agreed that all of its orders "shall be subject to the approval of Springs's credit department." Similarly, Blind Maker complains that Springs ceased to do business with it after the FLA terminated, yet the FLA required Springs to sell goods to Blind Maker only during the term of that agreement. We hold there is no evidence to support Blind Maker's termination theory.

### *Disposition of evidentiary sufficiency challenge to fraud finding*

In conclusion, we hold there is legally and factually sufficient evidence to support the jury's finding of fraud. Specifically, there is sufficient evidence to support both Blind Maker's customer list fraud theory and its fraudulent inducement theory, to the extent the latter is predicated upon evidence that (1) Springs misrepresented that Blind Maker would receive certain preferred fabricator benefits and Gold preferred fabricator benefits if it signed the FLA as that classification

60

of fabricator; (2) Springs failed to disclose its view that these representations were mere "intentions" and not firm commitments; and (3) Springs misrepresented and failed to disclose its intentions regarding its new "partnership" with Blind Maker, while pursuing Project Overlord.

**Actual damages**

In its second issue, Springs challenges the legal and factual sufficiency of the jury's $5,167,240 award as actual damages. Because Springs is not contesting the form of the actual damage submission, the starting point for our analysis is again the jury charge as submitted. *See Osterberg*, 12 S.W.3d at 55; *Jackson,* 116 S.W.3d at 762.

### *The charge*

Question 2 inquired of the jury, "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate The Blind Maker for its damages, if any, that were proximately caused by Springs's fraud?" It then provided standard *Pattern Jury Charge* instructions regarding damages and proximate cause.[37] Following these instructions, the jury was asked to consider only a single element of damages: "Lost profits that were a natural, probable, and foreseeable consequence of Springs's fraud." The jury was then asked to determine, and state in separate blanks, the amount of such lost profits that (1) "were sustained in the past by The Blind Maker"; or (2) "in reasonably probability will be sustained by The Blind Maker in the future." The jury awarded $0 for future lost profits but $5,167,240 as past lost profits.

---

[37] *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Pattern Jury Charges: Business, Consumer, Insurance, Employment* (PJC) 100.9, 110.20 (2002).

*Legal standards*

Lost profits may be recovered as fraud damages either as direct damages or consequential damages. Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong. *Arthur Andersen & Co v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997). Direct damages compensate the plaintiff for the loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act.[38] *Id*. Texas law recognizes two measures of direct damages for fraud: out-of-pocket damages, which are measured by the difference between the value actually paid and the value actually received; and benefit-of-bargain damages, which is measured by the difference between the value as represented and the value actually received. *Formosa*, 960 S.W.2d at 49. Lost profits can be a component of benefit-of-the-bargain direct damages; they, like other benefit-of-bargain damage components, are measured by comparing the anticipated profits under the fraudulently promised bargain with profits actually received. *Id*. at 50. They are not available as out-of-pocket damages because that measure "only compensates for actual injuries a party sustains through parting with something, not loss of profits fraudulently promised, in a bid not made, and a profit never realized, in a hypothetical bargain never struck." *Id*. at 50-51.

Consequential damages result naturally but not necessarily from a defendant's wrongful acts; they must be the foreseeable result of the wrong and must be directly traceable to it. *Arthur Andersen*, 945 S.W.2d at 816. "In the proper case, consequential damages could include

---

[38] Thus, the PJC exemplar for lost profits as direct damages from fraud omits the requirement that the damages be foreseeable and proximately caused by the injury. *Id*. PJC 110.3, 110.19.

foreseeable profits from other business opportunities lost as a result of the fraudulent misrepresentation" or nondisclosure. *Formosa*, 960 S.W.2d at 49 n.1.

Blind Maker concedes that it did not seek lost profits as direct, benefit-of-bargain damages. It is thus not seeking, for example, any profits it might have anticipated under the FLA and preferred fabricator benefits program had Springs provided the benefits as promised. Instead, Blind Maker sought lost profits solely as consequential damages; *i.e.*, those arising from business opportunities it lost because of Springs's fraud. This choice of damage remedies is reflected in Question 2, which tracked the *Pattern Jury Charge* exemplars for consequential damages caused by fraud[39] and lost profits as consequential damages.[40] Our inquiry is thus whether there is legally or factually sufficient evidence of past consequential lost profits damages to support the jury's $5,167,240 award.[41]

When determining whether legally and factually sufficient evidence of past consequential lost profits damages supports the jury's award, we are mindful of several important

---

[39] *See id*. PJC 110.20.

[40] *Compare id*. PJC 110.20, *with id*. PJC 110.3 (direct damages), *and id*. PJC 110.4 (consequential damages).

[41] As a threshold matter, we reject Blind Maker's argument that we should consider evidence (if any) of other elements of damages that were not submitted (such as out-of-pocket damages) as additional support for the jury's damage award. Invoking rule of civil procedure 279, Blind Maker characterizes the submission of consequential lost profits damages as the submission of a single element of a "ground of recovery"—"actual damages"—such that any omitted elements of actual damages supported by factually sufficient evidence must be deemed found in a manner supporting the judgment. *See* Tex. R. Civ. P. 279. But rule 279 operates only as to liability theories— "independent grounds of recovery or of defense"—not damages. Moreover, Blind Maker's interpretation of rule 279 would contradict and undermine the supreme court's directive that, when reviewing the sufficiency of evidence supporting a jury's damage award, our starting point is the charge as submitted. *See Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 762 (Tex. 2003).

standards governing the manner in which lost profits must be proven under Texas law. First, lost profits, by definition, must be *profits*, and should not be confused with economic gains or losses that are a mere component of a lost profits calculation or with other types of economic harm that may be compensable through different damage elements. *See*, *e.g.*, *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992) (proof of "lost income" is not proof of lost profits). Lost profits are damages for the loss of *net* income to a business, *Miga v. Jensen,* 96 S.W.3d 207, 213 (Tex. 2002), and, broadly speaking, reflects income from lost business activity less expenses that would have been attributable to that activity. *See generally Capitol Metrop. Transp. Authority v. Central of Tenn. Ry. & Navigation Co.*, 114 S.W.3d 573, 581-82 & n.7 (Tex. App.—Austin 2003, pet. denied) (considering both income projections and specific expenses when evaluating proof of lost profits).

Second, while there is no one correct method for calculating lost profits, once a party has chosen a particular method, "[r]ecovery of lost profits must be predicated on one complete calculation." *Holt Atherton*, 835 S.W.2d at 85. It is not enough to supply "pieces of several different methods of calculating lost profits." *Id*. In *Holt Atherton*, the supreme court cited our discussion in *Fleming Mfg. Co. v. Capitol Brick, Inc.*, 734 S.W.2d 405, 407-08 (Tex. App.—Austin 1987, writ ref'd n.r.e.), as "demonstrat[ing] a complete calculation of lost profits." *Holt Atherton*, 835 S.W.2d at 85. *Fleming* illustrates a calculation of lost profits taking into account (1) the number of bricks that would have been produced while a brick mold was not operational; (2) whether the bricks would have been sold (as evidenced by existing contracts and sales projections derived from past sales and market conditions); (3) prevailing market price; and (4) average net profit on bricks sold. *Fleming*, 734 S.W.2d at 407-08.

64

Finally, to recover lost profits, by whatever method calculated, "the amount of the loss must be shown by competent evidence with reasonable certainty." *Southwest Battery Corp. v. Owen*, 115 S.W.2d 1097, 1098 (Tex. 1938); *see Texas Instruments, Inc. v. Teletron Energy Mgt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994) ("We have consistently reaffirmed the *Southwest Battery* decision."). As this court has previously explained:

> The supreme court has consistently held that in order to recover lost profits, the loss amount must be shown by competent evidence with reasonable certainty. The test is a flexible one in order to accommodate the myriad circumstances in which claims for lost profits arise. What constitutes reasonably certain evidence of lost profits is a fact-intensive determination. However, the injured party must do more than show it suffered some lost profits. At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained.

*Capitol Metro. Transp. Auth.*, 114 S.W.2d at 579 (internal citations omitted). Thus, we have held that "lost profit" calculations are no evidence of lost profits when our examination reveals them to be predicated on unfounded, speculative assumptions. *Id*. at 579-82; *Fleming*, 734 S.W.2d at 407-08 ("We cannot . . .conclude that *lost profits* were proven . . .with that degree of reasonable certainty required when the only evidence offered concerned *anticipated or potential production*") (Emphasis in original.); *see also Texas Instruments*, 877 S.W.2d at 279.

### Blind Maker's evidence

As proof of consequential past lost profits damages, Blind Maker relied on two sets of calculations. First, Blind Maker offered the testimony and analysis of its damages expert, Dr. James R. Vinson, who stated that Blind Maker incurred over $11 million in what he characterized

as "lost profits." Second, Blind Maker entered into evidence a series of calculations prepared by Blind Maker personnel, titled "Plaintiff's Compilation of Damages," that reflected a total damage amount of over $10 million.[42]

*Vinson's testimony*

Vinson testified that he calculated his "lost profits" figure through what he termed the "before and after" method—he compared Blind Maker's financial performance before the company's January 1999 execution of the FLA to its performance thereafter. As Vinson put it, the before and after method "is a very straightforward, simple methodology. . . . What it means is, you look at the operation of the business as it occurred especially over a long period of time. And then you look at an event. And then you look at the business after the event before and after." For his "before" figures, Vinson relied primarily on Blind Maker balance sheets and income statements between 1991 to 1998; his "after" figures were derived from those documents for the period between 1999 and August 2002, the time of trial.

Vinson's concept of measuring lost profits by calculating a business's overall profit before and after an event finds support in Texas law, especially where the business has a "track record" of profitability. *Southwest Battery*, 115 S.W.2d at 1098-99 ("Where the business is shown

---

[42] Additionally, following submission on appeal, Blind Maker has offered various additional explanations and characterizations of the evidence in the record in an attempt to demonstrate evidence of lost profits. In addition to summarizing Vinson's calculation and various cases, this exhibit proposes two new calculations of lost profits: (1) "lost profits [as] evidenced by reduction in net income" of $7,391,612; and (2) "lost profits evidenced by subtracting costs and expenses that [it] would have incurred from the lost gross revenues" of $5,336,235. Because Blind Maker did not present these alternative calculations in the trial court, they cannot do so here.

to have been already established and making a profit at the time when the contract was breached or the tort committed, such pre-existing profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost. It is permissible to show the amount of business done by the plaintiff in a corresponding period of time not too remote, and the business during the time for which recovery is sought."); *see also Fleming*, 734 S.W.2d at 407 (same).

Vinson provided a calculation of Blind Maker's lost profits based on historic profitability, but this measure falls short of the amount the jury awarded. Vinson acknowledged that Blind Maker averaged only $37,000 in annual net profits between 1991 and 1998—what Vinson himself termed "a small amount of net profit"—and actually operated at a loss during two of those years. Based on this average, Vinson projected "lost average profits" or "normal profits" of $100,064 between January 1999, when Blind Maker executed the FLA, and August 2002.

However, Vinson then added to this lost profits figure $7,552,490 in total net operating losses for the same time period (which he termed "lost net operating income") to yield a "combined total of lost profits" of $7,654.554. Vinson then added to his "combined total of lost profits" (1) $650,194 in various charge-offs to equity of unusable assets (*e.g.*, Graber inventory); (2) $3,523,610 in various other losses not yet charged-off; and (3) $652,583 in various non-operating losses to achieve "total losses" of $11,173,775.

At the time Vinson presented his damages calculation at trial, Blind Maker had been asserting several causes of action other than fraud and seeking recovery for a broad range of business losses other than lost profits. Vinson's testimony may have been intended to support these other damage theories; however, Blind Maker ultimately elected to seek only lost-profits damages for

fraud, so we must consider whether Vinson's testimony is legally and factually sufficient evidence of that single element of damages.

Blind Maker relies on the principle that a business operating at a loss can recover lost profits from specific lost business opportunities regardless of whether the company is making an overall profit. *Frank B. Hall & Co. v. Beach*, 733 S.W.2d 251, 257 (Tex. App.—Corpus Christi 1987, writ ref'd n.r.e.). It also notes that net profits are "what remains in the conduct of a business after deducting from its total receipts all of the expenses incurred in carrying on the business." *Turner v. PV Int'l Corp.*, 765 S.W.2d 455, 465 (Tex. App.—Dallas 1989, writ denied) (*quoting R.A. Corbett Transp., Inc. v. Oden*, 678 S.W.2d 172, 176 (Tex. App.—Tyler 1984, no writ)). In Blind Maker's view, its losses are thus merely "net profits that have not been achieved," which "are lost profits, as a matter of logic and law."

Blind Maker conceivably could have recovered lost profits from specific lost business opportunities in an amount that exceeded its overall average net profits. *See Frank B. Hall*, 733 S.W.2d at 258. However, that is not the "one complete calculation" that Vinson made. *Holt Atherton*, 835 S.W.2d at 85. Vinson calculated Blind Maker's *overall* "before and after" performance, not profits from specific lost business opportunities. Having made Blind Maker's overall performance the focus of his inquiry, the maximum lost profits that Vinson could have found were his projected overall net profits of $37,000 per year, or $100,064 past lost profits. Furthermore, we cannot speculate that any of Vinson's loss figures are comprised of lost profits from specific lost sales and business opportunities, as Vinson and Blind Maker made no attempt in the trial court to distinguish the portion of its losses attributable to lost profit on sales from other damages. *See id*.

68

("the bare assertion that contracts were lost does not demonstrate a reasonably certain objective determination of lost profits.").[43] The failure to demonstrate that these losses were lost profits as that concept is known to Texas law renders Vinson's calculation legally and factually insufficient to support the jury's award of $5,167,240.

However, Vinson also testified that reduced salaries and benefits to Ray Hicks represented lost profits. He explained in his report:

> The Blind Maker's profits are, to the larger part, paid out as officer's salaries and benefits, this item is actually a part of additional lost profits. The deficiency of this payment to officers (Ray Hicks) was $137,571.00 in 1999, $113,371.00 in 2000, and $150,371.00 in 2001. Through July 2002, the current year deficit is $115,133.00. This represents a total loss of $516,446.00.

In his testimony, Vinson again mentioned $516,000 in salary and benefits had been forgone by Ray Hicks as part of Blind Maker's lost profits.

In a closely held corporation such as Blind Maker, evidence of salaries to its owner/executive is relevant to a determination of lost profits. *See Bettius & Sanderson, P.C. v. National Union Fire Ins. Co.*, 839 F.2d 1009, 1014 (4th Cir. 1988). In *Bettius*, the Fourth Circuit Court of Appeals explained this concept in the context of a professional corporation:

> [T]he professional corporation desires to disburse its earnings in order to avoid having income taxes imposed twice on what is in reality the same group of people.

---

[43] Blind Maker also suggests that the testimony of Springs's damages expert, Dr. Avera, independently supports the jury's award. Responding to Vinson's calculation of over $11 million in total business losses, Avera offered an alternative calculation of Blind Maker's total business losses as only around $6 million. Avera's testimony established total business losses, but does not support $6 million in lost *profits*.

. . . This is accomplished by distributing all or most of its earnings to the principals as compensation before calculating the professional corporation's net income. The result, of course, is that the corporation's net income for tax purposes is almost always at or near zero, but it is unrealistic to suggest that the corporation is not earning a profit. If we were to treat a net income as its net profit for the purpose of proving loss of profits it would rarely, if ever show a profit even when its shareholders were earning large incomes. It would never be able to prove damages for lost profits if the wrongful act of another caused it harm.

*Id*. at 1013. As in *Bettius*, a significant portion of Blind Maker's net income was distributed to its owner through compensation. Accordingly, a reduction in compensation due to Springs's fraud is a valid measure of lost profits. *See id*. at 1014. Thus, we find that there is evidence in Vinson's testimony to support $516,446 in lost profits attributable to lost executive salaries in addition to the $100,064 lost overall profits, or a total of $616,510 in past lost profits.

*Plaintiff's Compilation of Damages*

The "Plaintiff's Compilation of Damages" is comprised of sixteen line item categories of business losses calculated by Blind Maker's employees; supporting documentation is also supplied regarding each separate calculation. The line item figures are added to equal a total of $10,625,441. The calculation of this total suffers from the same basic defect as Vinson's calculation: it is a compilation of total business losses, not lost profits. Several of the line items clearly reflect out-of-pocket expenses, such as expenses from unusable inventory, equipment and samples, and out-of-pocket expenses incurred when Blind Maker claimed it had to purchase Springs materials from other fabricators. The $10,625,441 calculation is thus legally and factually insufficient to support the jury's award of lost profits damages.

70

Four of the line item calculations potentially appear to reflect lost profits. Treating each calculation as a distinct "one complete calculation," *Holt Atherton*, 835 S.W.2d at 85, we hold that one of these items constitute evidence of lost profits.

Line item G purports to reflect $5,703,283 in lost sales revenues attributable to Springs's pursuit of Blind Maker's customers by using information it had fraudulently obtained through the "Clear to the TOP" promotion, the basis for Blind Maker's "customer list" fraud theory. The supporting documentation explains that Blind Maker derived this figure by comparing its 1999 sales to "Clear to the TOP" registrants to its 2000 and 2001 sales to those same customers. Blind Maker then multiplied this figure by a 21.4% gross margin to yield $1,220,503.[44] The supporting documentation explains that 21.4% was Blind Maker's 2000 year-to-date gross margin as of May 2000, the month before Springs began using its confidential customer information from the "Clear to the TOP" promotion to compete against Blind Maker. Ordinarily, the calculation of lost profit damages must be based on net income, not gross revenue or gross profits. *See Edmunds v. Sanders*, 2 S.W.3d 697, 705 (Tex. App.—El Paso 1999, pet. denied) ("The correct measure of damages for lost profits is net profits."); *Turner v. PV Int'l Corp.*, 765 S.W.2d 455, 465 (Tex. App.—Dallas 1988, writ denied); *Mangham v. Hall*, 564 S.W.2d 465 (Tex. App.—Corpus Christi 1978, writ ref'd n.r.e.)

---

[44] The calculation of this figure in the "Plaintiff's Compilation of Damages" is inconsistent with that in the supporting materials. This may reflect rounding. In the Compilation, Blind Maker's $5,703,283 lost sales figure is multiplied by a 22% gross margin to yield $1,254,722, while the supporting documentation utilizes the 21.4% gross margin figure to yield $1,220, 503. An additional $50, 449 was added to reflect purchases made by Blind Maker to replace incentives that were to have been supplied by Springs as part of the program. The total damages stated in the supporting documentation is $1,270.952. Because the Compilation appears to reflect a summary or estimate, we will consider the more precise figure contained in the supporting materials.

However, Hicks testified that Blind Maker's net profits could be determined by subtracting overhead from gross margins. When a defendant's actions cause a reduction in the extent of business done by the injured party, but does not create any reasonable opportunity for the injured party to reduce its expenses, the defendant is entitled to no reduction in the damages awarded against him with respect to overhead costs. *Houston Chronicle Pub. Co. v. McNair Trucklease, Inc.*, 519 S.W.2d 924, 932 (Tex. App.—Houston [1st Dist.] 1975, writ ref'd n.r.e) (citing 5 Corbin on Contracts 1038 (1964)); *see DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421, 429 (5th Cir. 2003); *F.S. New Prod., Inc. v. Strong Indus., Inc.*, 129 S.W.3d 606, 624 (Tex. App.—Houston [1st Dist.] 2004, pet. filed). Here, the jury found that Springs committed fraud, and that fraud left Blind Maker with no way to reduce its expenses—Blind Maker's operating costs remained basically the same but Springs refused to sell Blind Maker more material, to buy back Blind Maker's unsold inventory, or to provide Blind Maker with service.[45] Under these circumstances, gross profits are an appropriate measure of lost-profit damages. We find this calculation to be sufficient evidence of $1,220,503 in lost profit damages.

Line item N reflects $850,000 in "lost profits" from lost sales of Nanik brand products. The supporting materials explain that Blind Maker was permitted under the FLA to sell Nanik products (which, like Graber products, were manufactured by Springs) as a distributor rather than as a fabricator. According to Blind Maker's calculations, it earned an average of $170,000 "gross profit" annually on its sales of Nanik products in 1999 and 2000. The $850,000 figure

---

[45] Ray Hicks explained, "If I don't have the sales, I don't have the gross margin, but I still have the overhead."

72

represents Blind Maker's projection of gross profits assuming that it earned this same $170,000 annual average gross profits from Nanik sales for five years following its termination of the FLA. In other words, this figure assumes that (1) Blind Maker would have continued distributing Nanik products during this five-year period (and, implicitly, that Springs had a legal obligation to allow it to do so even after Blind Maker had terminated the FLA); and (2) Blind Maker's sales of Nanik products during this five-year period would have remained at the average levels Blind Maker realized during the two-year span between 1999 and 2000. Blind Maker does not explain the bases for these assumptions, and its calculations are thus pure speculation and no evidence of lost profits.[46] *See Capital Metro. Transp. Auth.*, 114 S.W.3d at 580-82. In any event, the jury denied Blind Maker recovery of any future lost profits accruing after August 2002.

Line item O reflects "lost contract sales," attributes $694,947 in lost gross margins on lost sales "in the contract market as a direct result of an abrupt transition." Blind Maker distributed finished product from Springs for the commercial market. Blind Maker claimed losses from these contract sales that were discontinued as a result of the termination of the relationship between Blind Maker and Springs. However, this calculation projects Blind Maker's damages, including growth in sales, through December 2002. Because the jury did not award future lost profits, this calculation does not support the jury's award of damages. Furthermore, the damage from lost contract sales, as well as the lost Nanik sales, resulted from Springs's refusal to sell to Blind Maker. We have held that there is legally insufficient evidence to support Blind Maker's

---

[46] It is also unclear whether Blind Maker's "average gross profits" reflect net profits.

termination theory. Accordingly, there is also legally insufficient evidence to support damages based on Springs's refusal to sell certain products to Blind Maker.

Item R "lost GM $ in wood sales," purports to reflect $2,489,489 in lost gross margins from sales of wood products "which resulted from poor quality wood products delivered by the Graber required and specified supplier, and those losses in gross margin created due to poor product delivery during the transition." These figures are based on testimony that Blind Maker was forced by Springs to purchase its wood from a single supplier in Mexico. Ray Hicks explained that Springs's Mexican supplier provided low grade material that did not meet specifications. However, there is no evidence in the record that the quality problems were the result of any actionable conduct by Springs. Nothing in the record reflects Blind Maker's control over the quality of the wood produced by the supplier, or that the quality problems were intended as a part of Springs's fraud.

Except for the damages for lost sales to "Clear to the TOP" registrants, the calculations contained in Blind Maker's "Plaintiff's Compilation of Damages" are not sufficient evidence of lost profits.

### Disposition of actual damages issue

We hold that there is legally and factually insufficient evidence to support the jury's award of $5,167,240 in consequential lost-profits damages. However, there is sufficient evidence that Blind Maker incurred lost profits damages based on two measures—$616,510 under Vinson's calculations and $1,270,952 for lost sales attributable the customer list claim within the "Plaintiff's Compilation of Damages." The record now before us indicates that these two measures of damages overlap, as lost profits attributable to the customer list claim would necessarily have been factored

into Vinson's calculation of overall lost profits. Thus, at most, Blind Maker is entitled to recover $1,270,952 in actual damages, the larger of the two measures.

An appellate court may suggest a remittitur on its own motion when an appellant complains that there is insufficient evidence to support an award and the appellate court agrees, but there is sufficient evidence to support a lesser award. *See* Tex. R. App. P. 46.3; *see also Comstock Silversmiths, Inc. v. Carey*, 894 S.W.2d 56, 57 (Tex. App.—San Antonio 1995, no writ); *David McDavid Pontiac, Inc. v. Nix*, 681 S.W.2d 831, 838-39 (Tex. App.—Dallas 1984, writ ref'd n.r.e.). The party prevailing in the trial court must be given the option of accepting the remittitur or having the case remanded for a new trial. *See Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987). Accordingly, we suggest a remittitur of $3,896,288, the difference between the jury's award of $5,167,240 and $1,270,952, the highest amount of actual damages that Blind Maker's evidence supports.

**Exemplary damages**

When suggesting a remittitur regarding actual damages, we must also reevaluate the jury's award of exemplary damages. *See Bunton v. Bentley*, 153 S.W.3d 50, 54 (Tex. 2004). We review the award *de novo* to ensure that exemplary damages are not "grossly disproportional" to the gravity of the defendant's conduct. *Id.* (citing *Cooper Indus. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 434-36 (2001)). We consider (1) the degree of reprehensibility of the defendant's misconduct, (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages awarded by the jury and the civil penalties awarded or imposed in other comparable cases. *Id.* (citing *State Farm Mutual*

*Auto Ins. v. Campbell*, 538 U.S. 408, 418 (2003)). The most important of these considerations is the degree of reprehensibility of the defendant's misconduct. *Campbell*, 538 U.S. at 419. We are guided in examining a defendant's conduct and look to whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id.* Finally, because we have sustained some of Blind Maker's actual damages, we construe Springs's arguments about exemplary damages as an attack on the legal sufficiency of the evidence of exemplary damages. In reviewing a claim that evidence is legally insufficient under the clear and convincing standard applicable to the punitive damages award in this case, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Diamond Shamrock Ref. Co. v. Hall*, 168 S.W.3d 164, 170 (Tex. 2005) (quoting *Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 636 (Tex. 2004)); *see In re J.F.C.*, 96 S.W.3d 256, 264-68 (Tex. 2002); *see also City of Keller*, 168 S.W.3d at 817. We assume that the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so, and disregard all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible. *See Hall*, 168 S.W.3d at 170 (quoting *In re J.F.C.*, 96 S.W.3d at 266).

The jury awarded Blind Maker $2,090,000 as exemplary damages based on its finding of $5,167,240 lost profits. We have suggested a remittitur that would reduce the actual damages to $1,270,952. Applying the constitutional considerations discussed above, we first note that the Blind

76

Maker sufficiently proved that Springs implemented Project Overlord and sustained its implementation over the course of several years. Further, the jury found existence of fraud concerning the FLA, and the evidence connects that fraud to Project Overlord and Springs's subsequent activities. We have also reviewed the evidence concerning Springs's misrepresentations about the preferred fabricator benefits. Hicks testified that he would not have signed the FLA had he known that he could continue as a standard fabricator without it and if he had known that Springs did not consider itself bound to provide preferred fabricator benefits. Finally, there is evidence of Springs's misuse of Blind Makers's customer list after Springs gave assurances that the information would be kept confidential and would only be used by a third-party administrator. Together, as we have already noted, the evidence supports an inference that Springs had implemented a scheme to induce the Blind Maker into the FLA with false promises and to weaken it financially by fraudulent acts or by withholding and eliminating promised benefits, with the ultimate goal of either acquiring ownership of the Blind Maker or taking its customers. We conclude that the jury's award satisfies the *Bunton-Campbell* test and that a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. We emphasize that it is not Springs's desire to find alternate means of competing for Texas customers that forms the basis for our conclusions regarding "reprehensible conduct." Rather, it is the means by which that desire was effectuated, the pattern of behavior over time, and Springs's undermining of Blind Maker's financial viability through fraud.

In considering the disparity between the actual or potential harm suffered by the plaintiff and the exemplary damages award, we note that the ratio between our suggested actual

77

damages and the jury's award of exemplary damages is little more than 1:1.6.[47] The United States

Supreme Court has indicated that awards of exemplary damages that are less than four times the

actual damages are well below the line of constitutional impropriety. *State Farm*, 538 U.S. at 425.

Furthermore, we find the award of $2,090,000 to be reasonable in light of the fact that the civil

practices and remedies code would permit an award of exemplary damages of over $2.5 million. *See*

Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b) (West Supp. 2004-05); *Citizen's Nat'l Bank v. Allen*

*Rae Invs., Inc.*, 142 S.W.3d 459, 486 (Tex. App.—Fort Worth 2004, no pet.).

**Post-judgment interest**

The trial court signed the final judgment in this case on May 29, 2003 and set post-

judgment interest at 10%. In its final issue, Springs argues that, because the legislature amended the

finance code effective September 1, 2003, the post-judgment interest accruing after September 1,

2003 should be capped at 5%. *See* Tex. Fin. Code Ann. § 304.003(c)(2) (West Supp. 2004-05).[48]

We disagree.

---

[47] The disparity is even smaller when we consider the extensive damages presented by Blind Maker that were not submitted to the jury through the narrow lost profits issue. Although these damages did not support the jury's award of lost profits, they are relevant to exemplary damages because they represent actual harm suffered by Blind Maker. *See Bunton v. Bentley*, 153 S.W.3d 50, 54 (Tex. 2004) (citing *State Farm Mutual Auto Ins. v. Campbell*, 538 U.S. 408, 418 (2003)).

[48] *See* Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 1, 2003 Tex. Gen. Laws 2096, 2097 (effective June 20, 2003) (codified at Tex. Fin. Code Ann. § 304.003(c) (West Supp. 2004)); Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 6.01, 2003 Tex. Gen. Laws 847, 862 (effective Sept. 1, 2003) (codified at Tex. Fin. Code Ann. § 304.003(c) (West Supp. 2004)). These two bills were identical except for their effective dates. Because the judgment in this case was signed before June 20, 2003, we have no need to decide which effective date controls.

The amendments to the finance code at issue in this case provide that they apply "in any case in which a final judgment is signed or subject to appeal on or after the effective date of this Act." Many of our sister courts have confronted the issue of the applicability of the 2003 amendments and have uniformly concluded, based on the statutory language and the legislative history, that the amendments do not apply to judgments made final before the amendments' effective date. *See City of Houston v. Fletcher*, 166 S.W.3d 479, 493-94 (Tex. App.—Eastland 2005, pet. filed); *City of Dallas v. Redbird Dev. Corp.*, 143 S.W.3d 375, 388-89 (Tex. App.—Dallas 2004, no pet.) (quoting *Columbia Med. Ctr. of Las Colinas v. Bush*, 122 S.W.3d 835, 865-66 (Tex. App.—Fort Worth 2003, pet. denied)) (amendment applied to cases where judgment is signed on or after effective date of act and "to cases where a judgment becomes subject to appeal, *i.e.*, capable of being appealed, on or after the effective date of the Act"); *In re Kajima Int'l, Inc.*, 139 S.W.3d 107, 117 (Tex. App.—Corpus Christi 2004, pet. denied) (amendments apply only to judgment "that fully and finally disposes of all parties and all issues before the trial court and therefore is capable of being appealed"). In other words, the amendments apply to cases that become "capable of being appealed" after the amendments' effective date; they do not apply to those "pending appeal" as of the effective date. *Bennett v. Cochran*, No. 14-00-01160-CV, 2004 Tex. App. LEXIS 3545, at *26-27 (Tex. App.—Houston [14th Dist.] April 22, 2004, no pet.); *Cigna Healthcare of Tex., Inc. v. Pybas*, 127 S.W.3d 400, 421 (Tex. App.—Dallas 2004, no pet.).[49] In this case, the judgment was

---

[49] *See also Utts v. Short*, No. 03-03-00512-CV, 2004 Tex. App. LEXIS 2874, at *18-22 (Tex. App.—Austin April 1, 2004, pet. denied) (mem. op.).

capable of being appealed on May 29, 2003. Thus, the trial court did not err in applying a 10% post-judgment interest rate. We overrule Springs's final issue.

## CONCLUSION

We hold that while there is legally and factually sufficient evidence that Springs's committed fraud against Blind Maker, the evidence is legally and factually insufficient to support the full amount of actual damages the jury awarded. Although we have concluded that there is no evidence to support the jury's actual damages award, there is sufficient evidence that Blind Maker incurred $1,270,952 in lost-profits damages. Subtracting $1,270,952 from the jury's award of $5,167,240 in actual damages reveals a difference of $3,896,288. Accordingly, we suggest a remittitur in the amount of $3,896,288. *See* Tex. R. App. P. 46.3. If the sum is not remitted, the judgment will be reversed, and the cause will be remanded to the trial court for a new trial. Having reevaluated the jury's award of exemplary damages in light of the remittitur, we affirm the jury's award. We have also overruled Springs's argument that concerning the appropriate post-judgment interest rate.

In sum, we affirm the judgment of the trial court conditioned on the remittitur of $3,896,288. *See* Tex. R. App. P. 46.3. If Blind Maker files a remittitur of $3,896,288 with the clerk of the district court within thirty days of this opinion and judgment and notifies this Court as such, we will reform the trial court's judgment and, as reformed, affirm.[50] *See id.* If the Travis County

---

[50] In our July 29, 2005 opinion, we suggested a remittitur of $3,279,778. We have been informed by the Blind Maker that it filed a remittitur in that amount while the motion for rehearing was pending. To comply with this opinion, the Blind Maker must file an additional remittitur of $616,510 with the clerk of the district court within thirty days of this opinion and judgment and notify this Court as such.

District Clerk does not receive Blind Maker's remittitur within thirty days of this opinion and judgment, we will reverse the trial court's judgment and remand the cause to the trial court for a new trial.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Affirmed Conditioned on Remittitur

Filed:   January 20, 2006